■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v UMAR MAJEER, Appellant. — Judgment, Supreme Court, New York County (Stanley Sklar, J.), rendered March 2, 1981, convicting defendant, upon a jury verdict, of the crime of murder in the second degree (Penal Law, § 125.25), and sentencing him to an indeterminate term of imprisonment of 18 years to life, is affirmed. ¶ By February, 1980, for more than five years, defendant Umar Majeer had been working as a plumber and maintenance man in the neighborhood located in the area around 145th and 146th Streets in Manhattan. He lived in 235 West 146th Street and he was the building's superintendent. On or about the evening of February 19, 1980, defendant, his girlfriend Mildred Frasier (Frasier), and another woman named Arnicia Davila (Davila) went to a bar-type lounge in Brooklyn. After spending some time there, the three of them then drove to a Harlem hotel, in which the defendant had a room. When defendant fell asleep, Frasier took $1,000 of defendant's money, which she shared with Davila, and then both women left the hotel before the defendant woke up. A few days later, defendant went to Davila's father's glass store,

which was situated at 227 West 145th Street, and told Davila's father that Frasier and Davila had taken $1,000 from him while he was sleeping. Over the course of the next couple of weeks, almost daily, defendant was observed knocking loudly on the entrance door to Davila's apartment but Davila did not answer. Her ground-floor apartment was in a different part of the same building that contained her father's store. ¶ During this period Collin Parker (Parker) worked in Davila's father's store and he had been so employed for some six years. Parker knew the defendant from seeing him around the neighborhood and as a regular customer of the store. ¶ After the store closed, at about 10:00 or 10:30 P.M., on the evening of March 13, 1980, Parker, Davila and another man went to Davila's apartment, where the three of them consumed some food and shared a pint bottle of Baccardi rum, mixed with Coca Cola. At a little past midnight, they decided to leave the apartment to obtain some beer. ¶ Parker opened the apartment door, with Davila beside him. As Parker moved into the well-lit hallway of the apartment house, he recognized the defendant standing there, a few feet away. According to Parker's trial testimony: "He [defendant] said, 'Bitch, do you have my money?' Then he said, 'Bitch, I told you I'm going to kill you * * *' [Davila] put her arms up. [She] walked in front and then he shot * * * her in the head" (material in brackets added). Further, Parker testified that even though Davila collapsed to the ground as a result of that shot, defendant pointed his gun down and fired two more shots into her prone body. Parker testified defendant turned and walked out of the building. Within a few hours thereafter, defendant was arrested and charged with Davila's murder as a result of Parker's identification and statement. ¶ At trial, the defense was alibi. Supporting the alibi was the testimony of defendant and Frasier, to whom defendant admitted he gave money after the death of Davila. They testified that they drove from Harlem to Brooklyn, where they had dinner, went to a lounge for drinks and checked into a Brooklyn hotel called the Lincoln Plaza because of the hazardous road conditions that had resulted from the snowfall. Moreover, defendant and Frasier testified that they remained together in this room until they left the hotel between 2:00 and 3:00 A.M. and went to the 145th Street area in Harlem. The defense put into evidence, without objection, the registration card from the Lincoln Plaza that indicated defendant checked in at 10:53 P.M. It does not indicate any checkout time. ¶ The People rebutted with an agreed stipulation. In pertinent part, they stated that, a couple of weeks after the murder, a New York City police detective conducted a test drive from the Lincoln Plaza Hotel to the scene of the crime, a distance of 13.8 miles, and that driving at around midnight at a speed of 35 miles per hour or less, it took him 30 minutes to complete the trip. ¶ In the last analysis, this case boiled down to a question of defendant's alibi against Parker's eyewitness testimony, which was subjected to a searching cross-examination by defense counsel. Everything was before the jury, including the registration card. ¶ We find that the jury's verdict of guilty is supported by the evidence. We have said in the past and the words are equally applicable herein: "[c]redibility is to be determined by the trier of the facts" (*People v Samuels*, 68 AD2d 663, 666, affd 50 NY2d 1035). Thus, the defendant's contention that he was not proven guilty beyond a reasonable doubt is without merit. ¶ We do not perceive our function as a mandate to substitute our judgment for that of the jurors: "[v]iewing the evidence as a whole * * * we believe that it presented a question which could only be solved by a jury * * * Better than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused" (*People v Cohen*, 223 NY 406, 422-423). Significantly, even the dissent concedes that it was "physically possible" for the defendant to have left the subject hotel in time to have murdered Davila. We note in passing that the dissent, in setting forth

some reasons why the defendant might have gone to the hotel, left out an important one, and that reason is to establish an alibi. ¶ We have examined the other points raised by defendant and find them to be equally lacking in merit. Concur — Ross, Asch and Lynch, JJ.

Kupferman and Silverman, JJ., dissent in a memorandum by Silverman, J., as follows: I would reverse the conviction and dismiss the indictment. ¶ Here, as in *People v Kidd* (76 AD2d 665, 666), "[w]e recognize that the determination of guilt is for the jury, which has not only the legal responsibility to do this, but has the advantage of seeing and hearing the witnesses, which we have not. Nevertheless, we are left with a disturbing feeling of a grave risk that an innocent man has been convicted." ¶ The crime, the murder by shooting of the victim, took place at about 12:30 A.M. on March 14, 1980. One eyewitness, who knew the defendant at least casually, identified the defendant as the perpetrator. But that eyewitness, along with the victim and another person, had been drinking rum and Coca Cola from about 10:00 P.M. in the victim's apartment. After midnight they all decided to go out and get some beer. As they left the apartment they were confronted by a man who, in a brief altercation, demanded his money of the victim and said that he had told her he was going to kill her, which he thereupon proceeded to do by shooting her several times. The other witness did not see the gunman nor hear the conversation. Upon the identifying witness informing the police that he knew the defendant and that the victim's father knew the defendant's name, the police ascertained defendant's first name and his address, went to defendant's home and left a card asking that the defendant call them when he got back. A little later that day defendant arrived at the police station voluntarily with his girlfriend, where he was identified by the eyewitness. ¶ Defendant consistently claimed that he and his girlfriend had been at a Brooklyn hotel at the time of the shooting. ¶ What I find most disturbing about the case is that the defendant's version is supported by a registration card from a hotel at 53 Lincoln Place, Brooklyn, showing that he and another had arrived at the hotel at 10:53 P.M. on March 13, 1980. There appears to be no substantial reason to doubt the accuracy of this registration card. The time between that registration and the shooting on West 146th Street in Manhattan seems to me to be so short as to engender the grave misgiving that I have. Presumably the defendant went to the hotel to do something — either to sleep off the effects of drinking or to have a tryst with his girlfriend, or both. Even if one does not accept's defendant's and his girlfriend's version that they spent several hours at the hotel, it seems unlikely that he stayed at the hotel less than say three quarters of an hour. It was a snowy night. In the period between whenever he left the hotel and the shooting at about 12:30 A.M., defendant would have had to travel in bad driving conditions from the hotel in Brooklyn to the building at West 145th Street in Manhattan, where the shooting took place, dispose of the car and drop his girlfriend, go to the apartment and shoot the victim, all by about 12:30 A.M. It is physically possible that that is what happened, but I am very doubtful about it.