THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT SHEDRICK, Appellant.

Fourth Department, December 14, 1984

## APPEARANCES OF COUNSEL

*David A. Shults* for appellant.

*Larry D. Bates, District Attorney,* for respondent.

### OPINION OF THE COURT

MOULE, J.

At 9:30 A.M. on January 22, 1980, the bludgeoned bodies of Frank and Virginia Kiff were found by their daughter in their home on West Washington Boulevard in the Village of Bath. The body of Mrs. Kiff, age 74, was in a sitting room near the bathroom; that of Mr. Kiff, age 79, was in the pantry near the kitchen. Both bodies were fully clothed and lay in pools of blood. The kitchen door leading to the rear porch was slightly ajar and the window glass in it had been broken; shards of glass were on the kitchen floor. Mrs. Kiff still had on a large diamond ring on her right hand and her wedding band, but her purse and a desk in the sitting room near her body appeared to have been ransacked. Mr. Kiff was not wearing any jewelry when found; his wallet, located near his body, contained no currency.

The victims were pronounced dead by the Steuben County Coroner shortly after 10:00 A.M. that day; the Coroner believed they had died between 9 and 11 hours earlier. An autopsy revealed that the deaths resulted from multiple blows to the head with a heavy instrument.

Police learned that the Kiffs had been playing bridge on the night of January 21, 1980 at the nearby Wightman Primary School. Witnesses told police that the Kiffs had left the school at approximately 11:20 P.M. Police estimated that it took but 45 seconds to drive from the school to the Kiff residence. A friend of the victims observed that, at the school, Mr. Kiff was wearing a large diamond ring and that Mrs. Kiff, in addition to wearing the diamond ring on her right hand and wedding band, was wearing her engagement ring.

Defendant and two others, Edward Ames and Harry Barnes, were arrested for an unrelated matter, possession of stolen coins, on the afternoon of January 22, 1980. All three, along with defendant's sister, Wanda Shedrick, were later accused of committing the Kiff homicides. Defendant was subsequently charged in a 10-count indictment with two counts each of intentional murder (Penal Law, § 125.25, subd 1), felony murder (Penal Law, § 125.25, subd 3), first degree robbery (Penal Law, § 160.15, subd 1), petit larceny (Penal Law, § 155.25), and one count each of first degree burglary (Penal Law, § 140.30, subd 2) and fourth degree conspiracy (Penal Law, § 105.10, subd 2).[1]

Defendant moved for a change of venue in October, 1980. Defendant's application was subsequently denied by our court on the ground that defendant had failed to show he could not receive a fair trial in Steuben County. It was ordered, however, that the trial be "held in a courthouse other than the one at Bath". Defendant was further informed by the court in its order that he could make another application in the event that jury selection showed that an impartial jury could not be selected. Defendant subsequently made a second application for a change of venue on the eve of jury selection, which we rejected as premature. Jury selection was completed without further application; significantly, defendant failed to exhaust his peremptory challenges.

At trial, the People's case was based entirely on the testimony of one of defendant's alleged accomplices, Edward Ames, and two admissions defendant was alleged to have made while awaiting trial. No physical evidence connecting defendant to the crime was presented.

Ames testified that he met defendant, who was then his roommate, at a Bath pool hall on the afternoon of January 21, 1980. They left to go to the home of Harry Barnes, a mutual friend, "To split up some coins" that Ames had stolen earlier in the day. The three went to the Bath bowling alley to get something to eat, and then took a taxicab to a laundromat on Washington Street where they used a coin change machine to convert 50-cent pieces into quarters. They left the laundromat and walked across the street to a parking lot where they met Wanda, defendant's sister and Ames' girlfriend; she was driving a green Maverick. The group decided to drive to defendant's parents' home in Hammondsport where they met defendant's parents and two brothers, Bill, Jr., and Sherlock.

---

1. Six months prior to defendant's trial, Wanda Shedrick was convicted of two counts of felony murder, two counts of petit larceny, first degree burglary and fourth degree conspiracy.

Ames stated that Bill, Jr., drove him, defendant and Barnes to a nearby store to buy beer and gas. After they returned to the Shedricks' home, the group drank beer in the driveway and, later, defendant, Wanda, Barnes and Ames went into the house where defendant explained "a burglary that he wanted to do". Defendant stated that Barnes and Ames were to keep watch outside while Wanda waited in the car and he entered the house. Defendant identified the proposed victims as the owners of the Pontiac dealership in Bath. The four left the Shedrick home at around 10:30 P.M., drove to the primary school in Bath, and drove back to the West Washington Street laundromat. Barnes and Ames walked inside to change more coins as the others waited in the car. Defendant then came in and asked Ames to get the tire iron out of the trunk. Ames was familiar with the iron because he has used it earlier in the day; he obtained the trunk key from Wanda, opened the trunk and laid the iron on the ground behind the car. Ames returned the keys to Wanda and walked back into the laundromat. Ames stated that defendant had been standing next to the car and that he did not see the iron again that evening.

Ames further testified that, shortly thereafter, defendant walked into the laundromat to summon him and Barnes. The four drove to Pine Street, a street intersecting West Washington Boulevard near the Kiffs' home, exited the car and walked to the Kiff residence; no car was in the driveway and no lights were on in the house. Barnes walked to the far side of the house while Ames hid in the back yard. Defendant walked up the back porch to the door. Ames next heard "sounds like glass breaking and a door being pushed in". Ames saw an individual walk by the driveway, apparently taking a shortcut, while defendant was in the house. A few moments later, Ames heard a dog bark and saw a car pull into the Kiff driveway while defendant was still inside the house. Ames saw some lights turned on in the front of the house and then heard the screams of a man and a woman. Through a window visible from his hiding spot, Ames saw a silhouette of a male striking downward onto something laying on the floor.

After he saw defendant run from the house about 15 minutes later, Ames went over to the window and saw a body laying on the floor in a pool of blood. Ames recalled that a table light and an overhead light in the room had been turned on. Ames then ran toward Pine Street and jumped into the waiting car. Wanda drove the group to defendant's and Ames' apartment at 30 Buell Street. Defendant indicated that "it didn't go as planned", walked inside alone and returned wearing different clothing.

Wanda then dropped Barnes off near his apartment and drove the others to the Eatons' house on Morris Street. Defendant walked inside alone; Ames followed 15 minutes later.

Defendant and Ames left after watching some television and walked to Ames' nephew's home. During this walk, defendant displayed two rings and some paper currency to Ames. After smoking marijuana with Ames' nephew, defendant and Ames returned to the Eaton's where they spent the night.

Ames testified that upon returning to the apartment he shared with defendant on the following afternoon he opened defendant's closet and saw the tire iron he had taken out of the car the night before. The tire iron had blood and hair on it and there was a lot of blood on the floor; additionally, two rings were on the floor of the closet. Ames testified that defendant later told him that Wanda "had cleaned out the apartment" prior to a police search of the premises.

Ames' credibility was attacked at length during cross-examination. He admitted to convictions of attempted third degree burglary and petit larceny and to a probation violation. On the morning of January 21, he drank a pint of wine and had two hits of phenobarbital before going to the bowling alley, where he had four double seven and sevens and a pitcher of beer. He remembered having four hits of speed during the day but could not recall how many marihuana cigarettes he had smoked. Ames once described his condition as "being super super screwed up". Ames also admitted that he had received the opportunity to plead guilty to third degree burglary in exchange for his testimony. Ames' credibility was further impeached by his admissions that he had changed his account of what happened several times prior to trial and that he had threatened Wanda, after their relationship had soured, with implicating her and defendant in the Kiff homicides. On redirect, Ames explained that he had initially lied to investigators in an attempt to arrange a deal between Wanda and the authorities.

Joseph Eaton, Jr., testified that defendant and Ames arrived at his house around midnight on January 21, 1980, that they left for awhile and then returned before 1:00 A.M. Eaton observed nothing unusual about the pair, although he believed that Ames was intoxicated.

Deputy Sheriff James Woolridge took speedometer readings and mileage timings in an attempt to determine the veracity of Ames' story. It took Woolridge 8 minutes to drive from the Shedrick home to the Weston Country Store; 19 minutes to drive

from the Shedrick home to a downtown Bath intersection; and 2 minutes from that intersection to the West Washington Street laundromat.

Bath Police Sergeant Wenban jogged from the Kiff residence to Pine Street; the run lasted 1 minute and 5 seconds. He drove from Pine Street to defendant's apartment at 30 Buell Street; that took 1 minute and 5 seconds. It took 2 minutes and 10 seconds to drive from Buell Street to the Eaton residence on Morris Street. Wenban added five minutes to his total (assuming a five-minute visit at Buell Street) and determined that the total was in excess of nine minutes. Wenban estimated that it would take 45 seconds to drive from the Bath primary school to the Kiff residence.

James Jackson, an inmate at the Elmira Correctional Facility, testified that he and defendant became acquainted in February, 1980 while both were incarcerated at the Steuben County Jail. On February 6, Jackson asked defendant in the presence of Robert Laughlin if he had been involved in the Kiff matter and defendant answered "definitely yes to the burglary charge case of the Kiffs and on the murder charge it's hard to explain how he said * * * I asked him if he was the one that killed the Kiffs * * * and when I asked him and he just pointed to his eyes and asked me if those looked like the eyes of a killer". Defendant also mentioned that Wanda, Barnes and Ames were involved. Jackson stated that he had never conversed with authorities regarding a *quid pro quo* for his testimony.

Michael Campbell testified that he had a conversation with defendant while the two were in the Elmira Correctional Facility in May, 1980. On May 12 or 13, Campbell asked about the murders. Defendant replied, "I had to. They seen my face." On the following Friday, defendant "told me it was so well-planned that they would never catch him for it and that he passed a lie detector but failed some kind of stress test". Defendant had cased the place for at least two and a half weeks and knew that the Kiffs were playing cards at the school. Wanda had dropped off Ames, defendant and Barnes and hid the car. Wanda returned and defendant broke the glass on the door with his gloved fist. Defendant told Campbell that he jumped Mr. Kiff and that Barnes then jumped Mrs. Kiff. Barnes then removed the ring from Mrs. Kiff's finger and Wanda ransacked Mrs. Kiff's pocketbook. Barnes unsuccessfully tried to cut off one of Mrs. Kiff's fingers so that another ring could be removed. Campbell stated that defendant told him Mr. Kiff was killed in the pantry and Mrs. Kiff was killed near a foyer bathroom. Defendant mentioned that a tire iron was used in the killings and stated that

jewelry was taken and later hidden. Campbell also stated that defendant told him that he went to the Eatons' house and his parents' house to establish an alibi.

Campbell's credibility was impeached by a showing of extensive prior bad acts including a lengthy criminal record. Campbell admitted receiving a letter of recommendation to the parole department from the District Attorney in exchange for his testimony.

For the defense, Robert Laughlin testified that he shared a cell at the Steuben County Jail with defendant and Jackson in February, 1980. When Jackson inquired as to whether defendant killed the Kiffs, defendant jokingly replied, "Do these look like the eyes of a killer?" Defendant said nothing else regarding the murder or the burglary. Laughlin stated that Jackson asked defendant about the Kiff matter "at least once a day", and that defendant consistently denied having killed the Kiffs. Laughlin testified that Jackson has a poor reputation for veracity in the Steuben County Jail community.

Defendant's brother, Bill, Jr., testified, as did Ames, that defendant, Wanda, Barnes and Ames arrived at his parents' home on the evening of January 21, 1980, and then left a short time later to buy gas and beer at a nearby store. He disagreed, however, with Ames' testimony regarding the time the four left the Shedrick home; Bill testified that the group left at 11:00 P.M., a half hour later than Ames recalled. Bill claimed he remembered that the group left during the 11:00 P.M. news. On cross-examination, Bill admitted that he had once told authorities that he did not know when the four had left.

Defendant's mother, Mary Shedrick, also testified that the four left for Bath at 11:00 P.M.

In an attempt to establish that someone else had committed the crimes, defendant called Russell Mullahey who admitted previously claiming that he was responsible for the Kiff homicides. He stated that he made the admission to William Frazier as a joke. Mullahey denied making a similar admission to David Johnson. Johnson testified that Mullahey had called him on January 23, 1980 and stated that he had "flipped out and beat a couple people's brains in". Johnson's credibility was impaired by prior convictions for petit larceny, grand larceny and passing bad checks, as well as his admission that he had recently been treated for psychiatric problems. Bath Police Chief James Urey testified that, during the course of the investigation, he learned of Mullahey's admission to Frazier. Urey stated that Mullahey

was brought in and interrogated in his presence and that Mullahey had an alibi for the evening of the Kiff killings; police later checked out and were satisfied with Mullahey's alibi.

Defendant then testified concerning what transpired on January 21, 1980. His story was essentially the same as Ames' except for his claims that the group left his parents' home at 11:00 P.M. instead of 10:30 P.M., that he never discussed burglarizing the Kiff residence, and that the group did not go to the Kiffs' home later that evening. Defendant testified that Wanda drove the group back to Bath and dropped Barnes off at a convenience store near his home. The three then went to the West Washington Street laundromat. They arrived at 11:30 and exchanged more half dollars. After a few minutes, they drove to the Eaton home. No one opened the trunk of Wanda's car. Defendant stated that he walked inside alone at 11:50 while Ames and Wanda argued in the car. He talked with Mrs. Eaton and left a note for her husband. Ames walked inside a few minutes later and the two watched basketball for awhile before leaving for Ames' nephew's apartment.

Defendant admitted saying to Jackson, in response to his continuous questioning concerning the Kiff homicides, "Do I look like a killer to you? Do these look like the eyes of a killer to you?" Defendant denied ever claiming responsibility for the Kiff killings or burglary.

On cross-examination, the District Attorney improperly touched upon two prior bad acts committed by defendant which the trial court had ruled inadmissible in its *Sandoval* decision. Defense counsel failed, however, to object to either line of questioning.

On rebuttal, Carol Decker, defendant's former girlfriend, stated that defendant had told her during a visit to Elmira that "it was the way Eddie [Ames] said but he would prove him to be a liar". Decker stated that she received no consideration in exchange for her testimony and admitted being an alcoholic and a reformed narcotics abuser. Decker has a history of bad check convictions and has been treated for psychological problems.

Defendant voiced no objection to either the District Attorney's summation or the court's charge. After the jury had deliberated for 6½ hours, it found defendant guilty of two counts of each of the following crimes: second degree murder; second degree felony murder; first degree burglary; first degree robbery; petit larceny; and fourth degree conspiracy. Postverdict motions to set aside the verdict were denied. However, the court dismissed one

burglary and one conspiracy conviction because those counts were erroneously submitted.

Defendant raises five principal contentions on appeal: (1) that the Grand and petit juries were unlawfully constituted; (2) that extensive media coverage of defendant's trial and Wanda's earlier trial deprived him of a fair trial; (3) that Ames' testimony should have been disregarded as a matter of law; (4) that the court erred in refusing to conduct a *Daniels* hearing; and (5) that the court erred in refusing to conduct a *Clayton* hearing.

Defendant's first contention is that he was indicted and convicted by unlawfully constituted Grand and petit juries. They were unlawfully constituted, he claims, because the Steuben County jury districting system violates both article 16 of the Judiciary Law and the due process guarantees of the Sixth and Fourteenth Amendments of the Federal Constitution.

Under the Steuben County system, the county is divided into three jury districts: Bath, Corning and Hornell. When County Court convenes in the Village of Bath, grand and petit jurors are selected from the first jury district, which includes Bath and certain surrounding municipalities and, when it convenes in either Corning or Hornell, prospective jurors are selected solely from the district in which the court is sitting. The Bath district holds approximately 29,511 potential jurors or 30% of the population; Hornell holds 26,665 or 27%; and Corning holds 42,802 or 43%. Defendant was indicted in Bath and tried in Corning.

The Steuben County Board of Supervisors created the three district jury selection system in 1904 pursuant to State enabling legislation that permitted counties to adopt jury districting plans (see L 1892, ch 686, § 12, subd 14; L 1902, ch 119). This system, which was apparently adopted for the convenience of veniremen, has remained unchanged despite two important changes in State law.

The first change was made in 1942 when the county's power to create jury districts was repealed (L 1942, ch 799, § 20). That amendment neither expressly nor impliedly abolished existing districts that were lawfully created (*People v Wood,* Steuben County Ct, Sept. 18, 1979 [Purple, J.]; see, also, General Construction Law, § 93; McKinney's Cons Laws of NY, Book 1, Statutes, § 391; *Matter of Urban League of Rochester v County of Monroe,* 71 AD2d 787, revd on other grounds 49 NY2d 551; cf. *People v Johnson,* 110 NY 134). The second change, the one relied on by defendant, was made in 1977 when article 16 of the Judiciary Law was adopted. Section 500 provides: "It is the policy of this state that all litigants * * * entitled to trial by jury

shall have the right to grand and petit juries selected at random from a fair cross-section *of the community in the county or other governmental subdivision wherein the court convenes"* (emphasis added).[2]

■ Defendant argues that the italicized language specifically requires that prospective jurors be drawn from the entire county and, thus, that the Steuben County three district system conflicts with section 500 and is impermissible. We disagree.

Section 500 requires only that Grand and petit juries be selected at random from a fair cross section "of the community *in* the county *or* other governmental subdivision *wherein* the court convenes" (emphasis added). It does not require that the jury be drawn from a cross section of the community *of the county* wherein the court convenes. Further, the language of the statute and the memorandum accompanying it (Memorandum of Office of Court Admin, McKinney's Session Laws of NY, 1977, p 2617) show that article 16 seeks only to promote a fair, efficient and economical jury selection system. Since we view the Steuben County jury selection system as being in harmony with these goals and, since article 16 neither contains language expressly nor impliedly abolishing lawfully created districting systems, we decline to interpret article 16 as prohibiting the Steuben County jury districting system (*People v Wood,* Sept. 18, 1979 [Purple, J.], *supra;* see, also, General Construction Law, § 93; McKinney's Cons Laws of NY, Book 1, Statutes, § 391; *Matter of Urban League of Rochester v County of Monroe, supra;* cf. *People v Johnson, supra*).

Defendant also argues that the Steuben County jury selection system violates the Sixth and Fourteenth Amendments of the Federal Constitution; specifically, that Grand and petit juries were not selected from a group that is reasonably representative of a fair cross section of the community (*Duren v Missouri,* 439 US 357; *People v Guzman,* 60 NY2d 403, cert den __ US __, 104 S Ct 2155; *People v Parks,* 41 NY2d 36).

The Sixth and Fourteenth Amendments require that a jury be selected in an impartial manner from a group that is reasonably representative of the community. "[T]he deliberate exclusion of a particular community group or class of persons from jury service violates the constitutional right to a jury trial" (*People v Parks, supra,* at p 42). In order to show that he has been deprived of due process of law, a defendant bears the burden of showing,

<hr>

2. The policy reflected in section 500 is, in part, restated under section 514 of the Judiciary Law which provides: "[G]rand jurors shall be drawn at random from the list * * * of persons qualified as jurors in the county."

prima facie, that a substantial and identifiable segment of the community was not included in the jury pool because the process used to select jurors systematically excluded that group from service (*People v Guzman, supra*).

■ Here, defendant failed to establish a prima facie case. While it is true that, when a Grand or petit jury convenes in Bath, some 71% of the Steuben County population is excluded from jury service, defendant has failed to show that doing so systematically excludes a "distinctive" group or class of persons (*Duren v Missouri, supra,* at p 364). Defendant does not allege that the jurors from Bath were ethnically, economically, politically, or otherwise significantly different from those in the other Steuben County districts and that this disparity was represented in his panel (see *People v Waters,* 123 Misc 2d 1057). Absent such a showing, the jury selection system in Steuben County is not constitutionally infirm.[3]

■ Defendant's second contention is that extensive media coverage deprived him of a fair trial. The gravamen of defendant's contention is his claim that local publicity in this small, rural community was so widespread that it was impossible for him to draw a fair and impartial jury. In response to this same concern, our court has previously granted motions for change of venue where a defendant is able to demonstrate "reasonable cause to believe that a fair and impartial trial cannot be had" (*People v Acomb,* 94 AD2d 978; see, also, *People v Sawyer,* 94 AD2d 978). In our previous order denying defendant's motion for change of venue, we advised him to bring another such application "[i]f it develops during the voir dire that a fair and impartial jury cannot be drawn". Jury selection was thereafter completed without further application; indeed, defendant failed to even exhaust his peremptory challenges. Given these circumstances, defendant has failed to preserve this contention for our review (see *People v Pepper,* 59 NY2d 353, 358).[4]

Defendant next contends that the testimony of Edward Ames was "incredible as a matter of law". This contention is based

3. Section 1861 of title 28 of the United States Code, the Federal equivalent of section 500 of the Judiciary Law, does not require that all municipal subdivisions within a given locale form the basis for a jury pool (see *United States v Foxworth,* 599 F2d 1; *United States v Lane,* 574 F2d 1019, cert den 439 US 867; *United States v Mase,* 556 F2d 671, cert den 435 US 916; *United States v Test,* 550 F2d 577).

4. Additionally, even if we were to choose to review this contention in the interests of justice (CPL 470.15, subd 6), defendant's failure to include in the record any of the allegedly inflammatory newspaper articles he relies upon would preclude intelligent review of this contention.

principally upon Ames' inconsistent testimony and upon his drug and alcohol intoxication.

Testimony will be rejected as being incredible as a matter of law when it is "incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory" (*People v Stroman,* 83 AD2d 370, 373). Credibility is best determined by the trier of fact who has the advantage of observing the witnesses and, necessarily, is in a superior position to judge veracity than an appellate court, which reviews but the printed record (*People v Cohen,* 223 NY 406; *People v Majeer,* 100 AD2d 830; *People v Wright,* 71 AD2d 585).

In the final analysis, this case came down to a question of defendant's alibi against Ames' incriminating testimony. There is no inherent incredibility or improbability in Ames' testimony. While there are many inconsistencies, each was revealed to the jury which, nevertheless, chose to believe Ames rather than defendant. As the Court of Appeals has aptly stated, "If diverse inferences may properly be drawn from the testimony; if witnesses contradict each other, or if their character is criticized; if the probability of the stories told by them is questioned; if their interest in the result may influence them, it is for the jury to decide where the truth lies. We may not reverse its finding because some of us or all of us would have hesitated to reach the same conclusion" (*People v Cohen, supra,* at p 411).

■ Likewise, the jury could properly reject defendant's argument that Ames was too drunk or stoned to clearly recall what happened. Defendant did not dispute that Ames properly recanted what transpired from noon to 10:30 P.M. but only that he was mistaken or lying as to what occurred between 10:30 and 11:30 P.M. This selective dissection of Ames' testimony based on Ames' intoxication was clearly unwarranted since the bulk of his drinking and drug-taking had occurred earlier in the day. Ames' testimony was, thus, not incredible as a matter of law.

Defendant's fourth contention is that the trial court erred in refusing to conduct a *Daniels* hearing. In *People v Daniels* (102 Misc 2d 540), the court ordered a hearing pursuant to defendant's request to determine the reliability of a polygraph examination. Following the hearing, the court, after having satisfied itself as to the competence of the examiner, found that the results were scientifically reliable and ruled that the proffered evidence was admissible. Defendant argues that such a hearing should have been held here to determine the admissibility of a polygraph test he took and, apparently, "passed".

■ The trial court properly rejected defendant's request for a hearing. The law in New York is well settled on the question of admissibility of polygraph results; such results are clearly inadmissible (see, e.g., *People v Tarsia,* 50 NY2d 1; *People v Stuewe,* 103 AD2d 1042, application for lv to app den 63 NY2d 680).

Defendant's fifth contention is that the court erred in not conducting a *Clayton* hearing. In *People v Clayton* (41 AD2d 204, 207), the Second Department stated that a CPL 210.40 motion to dismiss an indictment in the interests of justice requires that a hearing be held. The *Clayton* court went on to list a number of factors that the court should consider in reaching its decision; these factors are now set forth in CPL 210.40 (subd 1). Defendant's contention here is premised upon the court's refusal to either dismiss the indictment or hold a hearing in response to his motion for dismissal in the interests of justice because of police misconduct.[5]

■ This court has never held that a hearing need be conducted whenever a defendant moves for dismissal in the interests of justice (see *People v Johnson,* 64 AD2d 821; *People v Anthony,* 60 AD2d 994). This position is supported by the Second Department's recent decision in *People v Macy* (100 AD2d 557): "In any event, a trial court may deny a motion to dismiss the indictment in the interest of justice without a detailed enumeration of the various statutory factors and *without a hearing* (see *People v Rickert,* 58 NY2d 122; Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 210.40, pp 155-156), and, on this record, we perceive no compelling factor which would have warranted the granting of the motion" (emphasis added). Similarly, while the conduct complained of by defendant was clearly reprehensible, it was not sufficient, especially considering the serious nature of the crimes charged, to warrant dismissal of the indictment and, hence, the court did not abuse its discretion in denying defendant's application on its merits.

We have considered defendant's other contentions and find them to be without merit.[6]

The judgment should be affirmed.

---

**5.** The conduct complained of by defendant consisted of police attempts to secure admissions from him by "planting" David Johnson in his cell; Johnson was apparently given some marihuana to take with him to the cell to help facilitate gaining the admissions from defendant.

**6.** We note that defendant's contentions relating to the District Attorney's cross-examination of him, the District Attorney's summation, and the court's charge were not preserved for review (CPL 470.05, subd 2) and we decline to review them in the interests of justice (CPL 470.15, subd 6).

HANCOCK, JR., J. P., CALLAHAN, GREEN and O'DONNELL, JJ., concur.

Judgment unanimously affirmed.