**JOSE RIVERA, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2014-0027

Supreme Court of the Virgin Islands

May 4, 2016

541

542

GORDON RHEA, ESQ., Richardson, Patrick, Westbrook & Brickman, LLC, Mt. Pleasant, SC, *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., KIMBERLY L. SALISBURY, ESQ., Assistant Attorneys General, St. Thomas, USVI, *Attorneys for Appellee.*

HODGE, *Chief Justice*; SWAN, *Associate Justice*; and HODGE, *Designated Justice*[1]

## OPINION OF THE COURT

(May 4, 2016)

HODGE, *Chief Justice.* Appellant Jose Rivera appeals from the Superior Court's May 2, 2014 judgment and commitment, which sentenced him to life imprisonment without the possibility of parole as punishment for being found guilty of first-degree murder. For the reasons that follow, we affirm Rivera's convictions but remand the case to Superior Court so that it may consider Rivera's motion for a new trial in the first instance.

---

[1] Associate Justice Maria M. Cabret is recused from this matter. The Honorable Verne A. Hodge, a retired Presiding Judge of the Superior Court, sits in her place by designation pursuant to 4 V.I.C. § 24(a).

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

Sometime in mid-June 2001, presumably on June 14, 2001, Virgin Islands Police Corporal Wendell Williams disappeared from the island of St. Croix. On June 21, 2001, Williams's sister reported him missing to the Virgin Islands Police Department ("VIPD"). The VIPD opened an investigation into Williams's disappearance and discovered that, although his time card at work was initially being punched on his behalf, he had stopped reporting to work and failed to claim wages owed to him by the VIPD. Williams failed to contact friends or family, or fulfill any of his routine obligations, such as paying bills. His car was also discovered, abandoned and burned.

After allegations that the VIPD was handling the case improperly, the Federal Bureau of Investigation ("FBI") became involved in the investigation. The FBI learned that Williams had confronted two other officers the day before he disappeared, alleging that they had not properly turned in a seized weapon. Theresa Coogle contacted the FBI, and on May 20, 2002, she informed them that she had witnessed Williams's murder. She told the FBI that multiple individuals — including Maximiliano Velasquez III, Jose Ventura, Jose Rivera, and Sharima Clercent — were present in an abandoned building near the Grapetree Hotel area of St. Croix when Williams was beaten, shot multiple times, and cut up with a saw. Days later, on May 31, 2002, the VIPD interviewed Coogle, who informed them that at the alleged crime scene she saw a black male, stripped down to his boxers with his hands tied behind his back, electrocuted by some unnamed men, and then shot in the hand by a man named Michael Lopez and shot in the head by Ventura. Coogle repeated her story to the VIPD on June 19, 2002, prompting the VIPD to visit the alleged crime scene and conduct a forensic examination of an abandoned building but no forensic evidence connected to this case was discovered.

From 2003 until 2011, no new evidence was uncovered and investigation into the murder case mostly ceased. Then, in 2011, the FBI gave its case file to the VIPD's new Cold Case Unit, which had reopened an investigation into Williams's disappearance. On June 15, 2011, Detective Frankie Ortiz re-interviewed Coogle. Based on information gained from this interview, Detective Ortiz returned to the Grapetree Hotel area to further investigate the alleged crime scene. He found a

second abandoned building — near the abandoned building processed in 2002 — that fit Coogle's description of the scene.[2] This time, the VIPD, in conjunction with the FBI and an Evidence Recovery Team from Puerto Rico, carefully processed the alleged crime scene at the second abandoned building and found items they considered evidence — including a broken blade, blood, and bullet indentations — of a potential murder scene, as indicated by Coogle. Despite these findings, Detective Felix testified that the laboratory tests of these items for DNA and fingerprints were negative. Nonetheless, Detective Ortiz requested, and was granted, a warrant for Rivera's arrest.

On February 10, 2012 — over ten years after Williams's disappearance — Rivera was arrested at his home in Georgia for Williams's murder, and extradited to the Virgin Islands. In a February 13, 2012 information, Rivera — along with Ventura, Maximiliano,[3] Clercent, and Juan Velasquez — was charged with having aided and abetted the murder in the first degree of Williams by shooting him with a firearm, in violation of 14 V.I.C. §§ 922(a)(1) and 11(a), and for having aided and abetted in the killing of Williams during the course of a kidnapping, or felony murder, in violation of 14 V.I.C. §§ 922(a)(2) and 11(a).

Jury selection commenced on January 21, 2014, and ended two days later, on January 23, 2014. In the time period leading up to the trial, and specifically while *voir dire* was being conducted, the local media covered the case in detail. Rivera's counsel represented to the court that a newspaper article had published standard mug shots of Rivera and his co-defendants and "then detailed recitations of the parade of horribles that supposedly took place during this . . . murder." (J.A. 966.) The *Virgin Islands Daily News* published a story that included photographs portraying the heightened security at the courthouse and another story publicized the fact that one of the People's witnesses was expected to be arrested for allegedly threatening a venireman to vote not guilty if selected to serve on the jury. The Superior Court recognized that out of

---

[2] VIPD detective George Felix testified that he assisted in processing "an old abandoned structure, somewhere in the bush," near the old Grapetree Bay Hotel in 2002. In 2012, he went back to the same grounds to process a second, smaller building that was located near the building he had processed in 2002. (J.A. 1969-70.)

[3] In this case, there are multiple individuals with the same last names, so to minimize confusion we refer to them using their first names when appropriate.

approximately 160 prospective jurors, about 30 responded that they had previously heard about the case through outside sources and had come to a conclusion as a result of that outside information. The court also noted that at least three prospective jurors had "expressed concern for their safety if ultimately selected as a juror." (J.A. 2425.) Due to this perceived bias of the potential jurors, Rivera elected to waive his right to a jury trial, along with his co-defendants, stating, through counsel, that because a change in venue was "virtually unavailable" a bench trial was "the most practical remedy" to ensure a fair trial since the "massive publicity about this case . . . has largely poisoned the jury pool." (J.A. 925.) However, the Superior Court denied Rivera's request after the People demanded a jury trial. Jury selection was completed, and Rivera responded to the court — through counsel — that he was satisfied with the selected members of the jury but still maintained his objections to a trial by jury.

The jury was empaneled and trial commenced on January 28, 2014. Jaslene Williams, Williams's sister, testified that she was the first person to realize Williams had disappeared because she had not seen or heard from him in days and, contrary to his usual practice, he had stopped checking their joint mailbox. She could not testify to the exact date of his disappearance but stated that she believed someone from the VIPD was responsible for Williams's disappearance, noting another VIPD officer had been signing Williams in for his shifts even though Williams had not been reporting for duty.

The People's prime witness was Theresa Coogle. Coogle testified that one night in June 2001, she and Maximiliano went out to dinner to celebrate their engagement. At the time, Coogle was seventeen years old and eight months pregnant with her second child by Maximiliano. After dinner, Maximiliano drove Coogle home, dropped her off, and then left. Coogle testified that later that same night, Maximiliano called her and asked her to pick him up near the Grapetree Hotel area of St. Croix. Coogle stated that she drove out to meet Maximiliano, and once she arrived to where he was waiting for her on the side of the road, she parked the car and followed him to a building. Coogle testified that upon entering the building, she saw a man stripped down to his underwear, on his knees, and with his hands bound behind his back and around a pole located in the middle of the room. She stated that this man had wire wrapped around his body and that he was being electrocuted, using power from a generator since the building appeared to be abandoned. She later recognized the

man as Williams from news reports of his disappearance. Coogle testified that she saw Rivera shoot Williams in his hand and Ventura shoot Williams in the mouth. Coogle stated that after stepping outside to vomit, she went back into the building, and watched Rivera cut-up Williams's body with a John Deere saw and place body parts into garbage bags. While back outside a second time, she saw Rivera and Ventura walking towards the shore carrying the garbage bags, where a boat was waiting. Coogle admitted that she and Clercent cleaned up Williams's blood, under orders from Maximiliano.

As part of her testimony, Coogle informed the jury that at a pretrial hearing held on January 27, 2014, she had confused Ventura and Rivera by identifying Rivera when asked to identify Ventura. Coogle explained that she had confused Rivera with Ventura because they were both named Jose and she and the attorney had just been discussing Rivera. Coogle also· acknowledged that she had given multiple statements to both federal and local law enforcement agencies, and that those statements were partly inconsistent with her in-court testimony.

During cross-examination, Rivera's counsel and the other co-defendants' attorneys fully explored all of Coogle's prior statements and highlighted the inconsistencies. For example, in Coogle's first statement to the FBI on May 21, 2002, she stated that Maximiliano drove her out to an abandoned building in a black Toyota pickup truck, which was reiterated in a May 24, 2004 interview with the FBI and the VIPD, and again in a July 8, 2004 interview with the FBI. But in an August 23, 2011 interview with the FBI, and as part of her trial testimony, Coogle said that she drove a maroon CRX herself to meet Maximiliano.

Rivera's counsel also highlighted the fact that in her first statement to the authorities she identified her sister, Sandy Rivera, as being present at the alleged crime scene but that she later retracted this statement, and firmly denied that her sister was there. Rivera's counsel brought out that in her second statement taken by the VIPD and dated May 31, 2002, Coogle said that there were also three Puerto Rican men at the abandoned warehouse at the time of the murder. During the May 31, 2002 statement, Coogle also informed the authorities for the first time that Williams had been electrocuted; in her first statement to the FBI she only said that he was beaten and shot. Likewise, in the transcript of a May 24, 2004 interview, Coogle reported that Williams was beaten and shot — without mentioning that he had been electrocuted — but that she could not

remember who performed those acts. A couple months later, in a July 8, 2004 interview with the FBI, Coogle mentions nothing about Williams being electrocuted, but states for the first time that he was tortured with stun guns.

During cross-examination, Coogle's credibility was attacked in multiple ways. Coogle testified that she could not recall telephoning a FBI special agent at the end of May 2003, and telling him that she would play dumb on the witness stand if she did not get her daughter back.[4] She also admitted in one of her statements to an FBI agent, that she may have been under the influence of some drug at the time of the murder, but could not recall what drug. Coogle also failed to report in her earlier statements that Williams was tied to a pole in the middle of the room, a fact emphasized by Rivera's counsel. Finally, Coogle testified to seeing a boat, but that she could not tell the color because it was dark. However, in different accounts she named three different boats — the *Regalito*, the *Ashes*, and the *Ashes II* — as the boat that was used to discard the body. Throughout her cross-examination, Coogle blamed the inconsistencies in her testimony on miscommunication with law enforcement, traumatization, or the fact that the authorities must have confused her statements with another homicide that she witnessed.

At the close of the People's evidence, Rivera moved for a judgment of acquittal, which the Superior Court denied as to the first degree murder charge but granted to him — and all his co-defendants — with respect to the felony murder charge. The court also dismissed the first degree murder charges brought against Juan Velasquez and Clercent.

In his defense, Rivera called as witnesses his two sisters, Gricel Rivera and Magali Roldan, who both testified that in June 2001 Rivera was recuperating from surgery and was in pain. Gricel testified that Rivera was shot in December 2000, which resulted in surgery and months of recuperation at Rivera's mother's house. She stated that on June 6, 2001, Rivera was readmitted to the hospital for pain in his stomach and that he underwent surgery on June 7, 2001, leaving behind an incision running from his breastbone to his navel that was closed with staples. Gricel testified that because of his surgery, Rivera needed assistance with even

---

[4] Apparently, it was during a hearing on terminating Coogle's parental rights in Florida — in either 2007 or 2008 — when Coogle saw Maximiliano, became scared, and decided to reach out once again to law enforcement agents about what she had witnessed.

minor tasks like getting up from the recliner, and that he was unable to drive a car for a month.

Dr. Lloyd Henry testified that Rivera arrived at the hospital on December 18, 2000, with multiple gunshot wounds, one in the abdomen and the others in the left arm and right hand. Rivera returned to the hospital in early June 2001, where he had an operation to remove scar tissue that had caused a blockage in his intestines. Rivera was discharged from the hospital on June 11, 2001, and his staples were removed on June 15, 2001. Dr. Lloyd testified that typically the recovery time for someone to walk upright without assistance after such a surgery was approximately ten days to two weeks after leaving the hospital. On cross-examination, Dr. Lloyd stated that he expected Rivera's recovery time to be shorter due to his youthful age.

Maximiliano's sister, Mariela Velasquez, testified that she moved to Miami, Florida in 1998, and that in March 2001, Coogle flew to Miami to take her eight-month-old daughter to see a doctor for an ear infection and stayed with Mariela. Mariela testified that Coogle got a job at a fast-food restaurant, and slept in her apartment every night until she delivered her second child in July 2001. According to Mariela, Coogle remained living with her in Miami until October 2001.

Previously, during cross-examination, Rivera's counsel questioned Coogle as to where she resided in June of 2001. Coogle testified that she lived on St. Croix with her mother, but that she went back and forth to Florida. She also stated that the reason she went to Miami, where she stayed with Mariela, was to escape her abusive relationship with Maximiliano. Later on in her testimony, she stated that she and Maximiliano had reconciled by June 2001, near the time of their engagement, and maintained their relationship despite the fact that Maximiliano was, in fact, at the time living with another woman who was also pregnant with his child.

Finally, Sandra Rivera, Coogle's sister, testified that she lived on St. Croix in June 2001, and that she brought her son to childcare at her mother's house every day. She stated that she knew "to a degree of certainty" that Coogle was not on St. Croix in June 2001, because Coogle did not attend their mother's birthday party and because she sent their mother pictures and letters from Miami. On cross-examination, Sandra admitted that she could not "positively, definitively" say that Coogle had not returned to St. Croix for a visit in June 2001.

At the close of all evidence, Rivera renewed his motion for a judgment of acquittal on the remaining murder count, which the Superior Court took under advisement. The jury returned a verdict on February 5, 2014, finding Rivera guilty of first-degree murder. The jury also found Ventura guilty, and Maximiliano not guilty, of first degree murder. *People v. Ventura*, No. SX-2012-cr-076, 2014 V.I. LEXIS 53, at *14 (V.I. Super. Ct. July 25, 2014) (unpublished). Rivera renewed his motion for judgment of acquittal, which the court denied. He never moved the court for a new trial. Rivera was sentenced to life imprisonment without the possibility of parole at a sentencing hearing on April 4, 2014, and the court's decision was memorialized in a May 2, 2014 judgment and commitment. Rivera timely filed a notice of appeal on April 29, 2014.[5]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Pursuant to the Revised Organic Act of 1954, ("ROA") this Court has appellate jurisdiction over "all appeals from the decisions of the courts of the Virgin Islands established by local law." 48 U.S.C. § 1613a(d); *see also* 4 V.I.C. § 32(a) (granting this Court jurisdiction over "all appeals arising from final judgments, final decrees or final orders of the Superior Court"). Because the Superior Court's May 2, 2014 judgment and commitment is a final order, this Court possesses jurisdiction over this appeal. *Codrington v. People*, 57 V.I. 176, 183 (V.I. 2012); *Williams v. People*, 55 V.I. 721, 727 (V.I. 2011).

This Court engages in a *de novo* review of the sufficiency of the evidence, viewing the evidence "in the light most favorable to the government." *Charles v. People*, 60 V.I. 823, 831 (V.I. 2014) (quoting *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009)); *Percival v. People*, 62 V.I. 477, 484 (V.I. 2015); *Cascen v. People*, 60 V.I. 392, 401 (V.I. 2014). "When reviewing a denial of a motion for a new trial, this Court 'will not interfere with the Superior Court's ruling absent an abuse of discretion.' "

---

[5] "A notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing the same, is treated as filed on the date of and after such entry . . . and is considered timely filed." *Powell v. People*, 59 V.I. 444, 451 (V.I. 2013) (quoting *Potter v. People*, 56 V.I. 779, 787 n.10 (V.I. 2012) (internal quotation marks omitted)); V.I.S.CT.R. 5(b)(1); *see Petric v. People*, 61 V.I. 401, 406 n.3 (V.I. 2014) (citing *Tyson v. People*, 59 V.I. 391, 399 n.5 (V.I. 2013)).

*Percival*, 62 V.I. at 490-91; *Joseph v. People*, 60 V.I. 338, 345 (V.I. 2013). But where the denial of a motion for a new trial is based on an application of a legal precept, our review is plenary. *Thomas v. People*, 60 V.I. 688, 693 (V.I. 2014); *Phillips v. People*, 51 V.I. 258, 280 (V.I. 2009). We also engage in plenary "review of all constitutional questions of law." *Carty v. People*, 56 V.I. 345, 354 (V.I. 2012). And finally, we review the Superior Court's decision regarding juror bias for an abuse of discretion. *Cascen*, 60 V.I. at 415 (citing *Dowdye v. People*, 60 V.I. 806, 812 (V.I. 2014)).

## B. Sufficiency of the Evidence

 Rivera challenges the sufficiency of the evidence presented by the People to support his first-degree murder conviction. When reviewing the evidence for sufficiency, this Court must look to see whether the People proved beyond a reasonable doubt each element of the crime charged when "view[ing] the evidence in the light most favorable to the People." *Percival*, 62 V.I. at 484 (quoting *Webster v. People*, 60 V.I. 666, 678-79 (V.I. 2014)). This Court has held that "murder in the first degree that does not involve poison, lying in wait, torture, or detonation of a bomb instead requires that the People prove the defendant (1) unlawfully killed another, (2) with malice aforethought, and (3) in a willful, deliberate, and premeditated manner." *Codrington*, 57 V.I. at 184-85. Malice aforethought "may be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences. And 'where the killing is proved to have been accomplished with a deadly weapon, malice can be inferred from that fact alone.' " *Nicholas v. People*, 56 V.I. 718, 732 (V.I. 2012) (quoting *Gov't of the V.I. v. Sampson*, 42 V.I. 247, 253 (D.V.I. App. Div. 2000)). Premeditation indicates the existence of a "design or plan to kill," which has been "reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation." *Brown v. People*, 54 V.I. 496, 507 (V.I. 2010) (quoting *Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985)). It "involves the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning *for a period of time, however short* [and] may be established by circumstantial evidence." *Nicholas*, 56 V.I. at 732 (quoting *Brown*, 54 V.I. at 506 (emphasis in original)).

Rivera contends that the only direct evidence linking him to the murder of Williams is Coogle's testimony, and he points out that Coogle's

statements before and during trial are "riddled with inconsistencies and were uncorroborated by any physical evidence or by the testimony of any other witness." (Appellant's Br. 27.) Rivera details the multiple discrepancies in Coogle's stories over the years and points out that some of the details of her testimony simply could not be possible, such as the fact that she said she identified Williams from the news a day or two after the killing when Williams was not reported missing until at least a week later, or the fact that she guessed Williams's height to be 5'9" — the height given in his disappearance posters — when she saw him only kneeling. And finally, Rivera relies on testimony that Coogle could not have observed Williams's murder because she was living in Miami in June 2001, and, according to Coogle's sister, she did not visit St. Croix that month because she was not at their mother's house — where Coogle normally stayed when on St. Croix — and she did not attend their mother's birthday party. Rivera did not present any physical evidence of Coogle's whereabouts in June 2001, and the People presented no other evidence, besides Coogle's own testimony, placing her on St. Croix at the time of the murder.

■ Consequently, the only evidence of Rivera's involvement in Williams's killing is anchored in Coogle's uncorroborated, eyewitness testimony.[6] In other cases, we have held that the testimony from a single eyewitness is sufficient to prove the elements of a crime. *See Percival*, 62 V.I. at 487 (holding the testimony of a single witness can be sufficient to prove a perpetrator's identity beyond a reasonable doubt); *Thomas v. People*, 60 V.I. 183, 193 (V.I. 2013) (same); *Francis v. People*, 57 V.I. 201, 211 (V.I. 2012) ("The testimony of one witness is sufficient to prove

---

[6] During oral arguments, Rivera's counsel was questioned as to whether Coogle could be considered an accomplice and if so, whether an accomplice instruction should have been given under 5 V.I.C. § 740(4), which provides that the trial court should instruct the jury that "[t]he testimony of an accomplice ought to be viewed with distrust." Although Rivera's counsel admitted that Coogle could be considered an accomplice if one were to believe that she helped clean up the blood, it was the defendants' theory that Coogle was not located on St. Croix at the time of the murder, and therefore could not have been an accomplice, and no such instruction was ever requested. Video Archive of *Jose Rivera v. People*, SUPREME COURT OF THE UNITED STATES VIRGIN ISLANDS http://visupremecourt.org/Media_Services/Video_Archive/videodisplay.asp?VideoID=170 at 00:17:56 (last visited March 16, 2016). Thus, the Superior Court did not err in not giving such an instruction. *See* 5 V.I.C. § 740 ("No party may assign as error the failure to give any such instruction unless he has requested the court to give it before the jury retires to consider its verdict.").

any fact."). While the uncorroborated testimony of a single witness may prove any fact, we must first assure ourselves that the testimony is trustworthy to ensure that the evidence given proves the defendant's guilt beyond a reasonable doubt. *See Connor v. People*, 59 V.I. 286, 290-91 (V.I. 2013) (citing 29A AM. JUR. 2D *Evidence* § 1402 (2012)). Nevertheless, as a general rule we will not disturb a jury's decision regarding a witness's credibility unless presented with some exceptional circumstance, and this is a high hurdle for a defendant to clear. *Thomas*, 60 V.I. at 192.

■ We have already determined that one such circumstance is when the evidence indicates that "it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all." *Id.* (quoting *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001) (internal quotation marks)). We believe the facts of this case — where the uncorroborated testimony of a single eyewitness who has provided law enforcement officers multiple versions of how the murder occurred and by whom, and where the body remains missing — amounts to an exceptional circumstance warranting special scrutiny.

Appellate courts around the country use a multitude of different standards when reviewing a claim that a witness's testimony is incredible as a matter of law, each with an exacting standard. 5 AM. JUR. 2D *Appellate Review* § 641 (a "trial court's judgments of credibility will not be disturbed on appeal without a compelling showing of error"). Appellate courts will "disregard testimony that the jury has found to be credible only if it is so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it." *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686, 696 (2015); *People v. Young*, 34 Cal. 4th 1149, 24 Cal. Rptr. 3d 112, 105 P.3d 487, 505 (2005) (holding an appellate court may evaluate witness testimony where the "the testimony is physically impossible or inherently improbable"); *State v. Dorsey*, 74 So. 3d 603, 634 (La. 2011) (holding "[t]estimony should not be declared incredible as a matter of law unless it asserts facts the witness physically could not have observed or events that could not have occurred under the laws of nature"). Other appellate courts will not revisit a jury's decision regarding a witness's credibility "unless the fact relied upon is inherently or patently incredible," *Chapman v. State*, 69 Wis. 2d 581, 230 N.W.2d 824, 825 (1975) (quoting *Simos v. State*, 53 Wis.

2d 493, 192 N.W.2d 877, 878 (1972)). And in some jurisdictions, an appellate court may reject a witness's testimony as impossible to believe "because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory." *People v. Shedrick*, 104 A.D.2d 263, 482 N.Y.S.2d 939, 947-48 (1984) *aff'd*, 66 N.Y.2d 1015, 489 N.E.2d 1290, 499 N.Y.S.2d 388 (1985) (quoting *People v. Stroman*, 83 A.D.2d 370, 444 N.Y.S.2d 463, 465-66 (1981); *People v. Minjarez*, 81 P.3d 348, 355 (Colo. 2003) ("A trial court may conclude that testimony is 'incredible as a matter of law' only when a witness's testimony conflicts with nature or fully established facts.").

The Indiana Supreme Court has developed comprehensive case law on this issue, and has previously "impinged upon a jury verdict where the supporting evidence was 'inherently improbable,' *Penn v. State*, 237 Ind. 374, 146 N.E.2d 240 (1957), of 'incredible dubiosity,' *Gaddis v. State*, 253 Ind. 73, 251 N.E.2d 658 (1969), or 'utterly impossible to believe,' *Hutchins v. State*, 140 Ind. 78, 39 N.E. 243 (1894)." *Pardue v. State*, 502 N.E.2d 897, 898 (Ind. 1987). In *Gaddis*, the Supreme Court of Indiana reasoned that the prosecuting witness's testimony was "vacillating, contradictory and uncertain," unsupported by any circumstantial evidence, and "the result of coercion," in holding that such testimony was insufficient to support a conviction — without more — as a matter of law. *Gaddis*, 251 N.E.2d at 661-62. Indiana courts have developed the "incredible dubiosity" rule as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Gregory v. State*, 885 N.E.2d 697, 704-05 (Ind. Ct. App. 2008) (quoting *Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007)). The Indiana Court of Appeals is quick to note that generally, "the uncorroborated testimony of one witness is sufficient to sustain a conviction on appeal" thus highlighting the difficulty of meeting this standard. *Id.* at 704 (citing *Seketa v. State*, 817 N.E.2d 690, 696 (Ind. Ct. App. 2004)). And it clearly holds that "dis-

555

crepancies between a witness's trial testimony and earlier statements made to police and in depositions do not render such testimony 'incredibly dubious.' " *Id.* at 705 (citing *Holeton v. State*, 853 N.E.2d 539, 541 (Ind. Ct. App. 2006)). Instead, it looks for " 'inherent contradiction' in the testimony of the witness under consideration" that is "so internally and inherently contradictory as to preclude any reasonable trier of fact from believing it." *West v. State*, 907 N.E.2d 176, 178 (Ind. Ct. App. 2009). In almost all cases, Indiana courts have upheld a defendant's conviction when the defendant's insufficient evidence argument is based on witness credibility. Notably, in *Fajardo*, the Supreme Court of Indiana upheld the defendant's conviction of child molestation because it found that the "equivocations, uncertainties, and inconsistencies" in the eleven-year-old witness's testimony were "appropriate to the circumstances presented, the age of the witness, and the passage of time between the incident and the time of her statements and testimony" making it "not so incredibly dubious or inherently improbable that no reasonable person could believe it." 859 N.E.2d at 1209.

█ In essence, appellate courts[7] will impinge upon the jury's role as judge of credibility only when confronted with "inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." 5 AM. JUR. 2D *Appellate Review* § 641. But even then, an appellate court may not overturn the jury's decision unless the falsity of the statement has been adequately established. *See Minjarez*, 81 P.3d at 355 (holding that "testimony that is merely biased, conflicting, or inconsistent is not incredible as a matter of law." (citing *People v. Franklin*, 645 P.2d 1, 5 (Colo. 1982) and *People v. Ramirez*, 30 P.3d 807, 809 (Colo. App. 2001)); *Dorsey*, 74 So. 3d at 634 (noting that a conviction can stand even when "based on the uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided the testimony is not incredible or otherwise insubstantial on its face." (citing *State v. Neal*, 796 So. 2d 649, 659 (La. 2001)); *Shedrick*, 482 N.Y.S.2d at 947-48 (holding that a verdict may not be overturned even if each individual member comprising the appellate

---

[7] We note that some jurisdictions do not permit review of a witness's credibility under any circumstance. *See, e.g., State v. Porter*, 439 S.W.3d 208, 211 (Mo. 2014) (court abolished its "destructive contradictions doctrine," which permitted the appellate court to disregard a witness's statements that were "so inconsistent, contradictory, and diametrically opposed to one another that they rob the testimony of all probative force." (quoting *State v. Uptegrove*, 330 S.W.3d 586, 590 (Mo. Ct. App. 2011)).

court "would have hesitated to reach the same conclusion" as the jury (quoting *People v. Cohen*, 223 N.Y. 406, 119 N.E. 886, 887, 36 N.Y. Cr. 419 (1918))); *Young*, 105 P.3d at 505 (holding that the "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact").

Each of the above standards, although using varying language, greatly limit an appellate court's ability to override the factfinder's decision. Nonetheless, we agree with the Indiana Supreme Court's analysis and hold that a conviction may be overturned when predicated on "wholly uncorroborated testimony of incredible dubiosity." *Fajardo*, 859 N.E.2d at 1208. This standard strikes an appropriate balance between permitting the fact finder to perform its role without impediment and protecting a criminal defendant's rights by dismissing — in the very rare occurrence — a witness's testimony that is "so incredibly dubious or inherently improbable that no reasonable person could believe it." *Id.*

Applying this standard to this case, we conclude that Coogle's testimony is not "of incredible dubiosity" such that no reasonable person could believe it. Although we recognize the details of her statements changed over the years, Coogle consistently stated that she went out to the Grapetree area of St. Croix one night in June of 2001, where she witnessed two individuals shoot a bound, kneeling man, which resulted in his death, and then dismember his body for eventual disposal from a boat. Her testimony at trial was clear and consistent. She identified Ventura as the person who shot Williams in the mouth, and that Rivera shot Williams in the hand. She also identified Rivera as the person who cut up Williams's body with a saw and that both he and Ventura brought the body parts to a boat in garbage bags. We recognize that during a pre-trial hearing, Coogle misidentified Ventura as Rivera, both of whom have the same first name, but she corrected herself and explained that her confusion was due to the line of questions being asked of her. We also note that she vacillated slightly when identifying whether it was Ventura or Rivera who shot Williams in the head,[8] but once again she corrected herself and affirmatively stated which person committed which act. There

---

[8] During trial, Coogle testified as follows on direct:

> Q. Who shot him in the hand?
> A. Jose Ventura.
>
> . . . .

was no indication that her testimony was coerced or that it went against any other established facts. During trial, her testimony was consistent, clear, and not inherently improbable, even under grueling cross-examination.

Although Rivera introduced testimonial evidence that it is highly unlikely Coogle was in the territory in mid-June, Coogle testified that she traveled back and forth between Miami and St. Croix, and this Court will not reevaluate the jury's decision to believe one witness over another. To hold otherwise would be to dismiss the jury's decision on nothing more than our own suspicions and beliefs, which we will not do. *See e.g.*, *John v. People*, 63 V.I. 629, 646 (V.I. 2015) (holding that "the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony" (quoting *Alexander v. People*, 60 V.I. 486, 510 (V.I. 2014)); *Thomas*, 60 V.I. at 191-92 (discussing witness credibility and that this Court applies "a highly deferential standard of review to the jury's verdict" (citing *Augustine v. People*, 55 V.I. 678, 684 (V.I. 2011)); *Williams v. People*, 56 V.I. 821, 835 (V.I. 2012) (noting this Court is prohibited from "determining the credibility of witnesses" (citing *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009)).

Concluding that there is no legal basis for us to disregard Coogle's testimony, we must next look to see if her testimony was sufficient to uphold Rivera's conviction. Coogle testified that she saw Rivera use a firearm to shoot Williams in the hand, and that Ventura shot Williams in the mouth. She further testified that Rivera dismembered the body, put the parts into garbage bags, and brought the bags to a boat with Ventura's help. Coogle's testimony does not establish that Rivera fired the fatal shot, only that he put a bullet through Williams's hand. According to Coogle, it was Ventura who shot Williams in his mouth. *See Phillip v. People*, 58 V.I. 569, 587 (V.I. 2013) (holding "the use of a deadly weapon against unarmed persons in the absence of any provocation is a fact that can weigh towards a finding of premeditation" sufficient to uphold a murder conviction). However, even if Rivera did not shoot the fatal shot, we can still uphold his conviction if he aided or abetted the murder.

---

Q. Who shot the officer in his mouth?
A. Your Honor, the person that shot him in his hand was ... was Jose Rivera, the person that shot him in his mouth was Jose Ventura.

(J.A. 98.)

Rivera was charged with his codefendants both as a principal actor and as an aider and an abettor to the homicide. There is significant circumstantial evidence that Williams is dead. There is evidence that Williams disappeared unexpectedly, and no one has reported seeing or hearing from him since June 2001, almost fifteen years ago. He failed to maintain his customary habits, check his mail, report for work, or keep in contact with friends and family, particularly his sister with whom he maintained a close relationship. From these facts we can infer that Williams is dead and that his death was likely caused by some criminal means. *See e.g., State v. Thompson*, 73 Wn. App. 654, 870 P.2d 1022, 1028 (1994) (holding that evidence establishing that the victim disappeared without contacting friends or family, providing for her cat, and after having made future appointments, strongly indicated she was dead and that her death was caused by criminal conduct); *Ex parte Bell*, 475 So. 2d 609, 616 (Ala. 1985) (holding that evidence that victim had stopped his habit of supporting his family and visiting his parents and had not been seen or heard by anyone was sufficient to infer that the two shots fired by the defendant caused victim's death). *See Ventura v. People*, S. Ct. Crim. No. 2014-0021, the opinion which is issued on even date herewith, for a more detailed discussion on Williams's death. What we must determine is whether the evidence sufficiently proved that Rivera knew of, and attempted to facilitate, the first-degree murder of Williams.

■ Generally, "a person charged as a primary actor can be convicted as an aider and abettor." *Hughes v. People*, 59 V.I. 1015, 1019 (V.I. 2013). We have expressly held that "[e]stablishing the offense of aiding and abetting requires the People to prove (1) that the substantive crime has been committed, and (2) the defendant knew of the crime and attempted to facilitate it." *Todman v. People*, 59 V.I. 675, 684 (V.I. 2013) (quoting *Clarke v. People*, 55 V.I. 473, 479 (V.I. 2011)). " 'Liability as an aider and abettor requires proof that [Rivera] associated himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his words or action to make it succeed.' " *Brown*, 54 V.I. at 508 (quoting *Nanton v. People*, 52 V.I. 466, 484 (V.I. 2009)). The People may show that the defendant "encouraged or helped the perpetrator" to establish the requisite intent. *Id.*

In this case, we have little difficulty, when viewing the evidence in the light most favorable to the People, in concluding that Rivera intended to kill Williams. Coogle's testimony established that Williams was bound,

kneeling, and tortured all before Rivera shot him. Rivera then stood by and watched as Ventura shot Williams in the mouth. *See id.* at 509 (upholding defendant's conviction for murder where the evidence indicated the defendant knew the principal actor intended to kill the victim and passed him a knife instead of attempting to deter him). Afterwards, Rivera actively helped cover up the crime by dismembering the body with a saw, placing the body parts into garbage bags, and bringing the bags to a boat for eventual disposal at sea. From this evidence a rational trier of fact could have found that Rivera had the requisite intent to aid and abet Ventura in the commission of first degree murder. *See id.* at 510; *Nanton,* 52 V.I. at 486-87 (upholding defendant's conviction for aiding and abetting in assault with a deadly weapon based on evidence that she distracted the victim so that her codefendants could attack and by striking the victim herself).

█ Rivera's alibi defense — that he was recuperating from surgery and could not have physically accomplished the acts of dismembering a body with a saw and carrying garbage bags filled with human body parts — is not a complete defense to either murder or aiding and abetting another in murder. Even while recovering from surgery, Rivera could have been present in the abandoned building in the Grapetree area. His physical condition would not have hindered his ability to shoot Williams in the hand or prevented him generally from aiding and abetting Ventura in committing murder. While his physical condition could have made it difficult to use a saw to cut up a body and then carry its parts to the boat, it would not have been impossible, especially in light of his likely quick recovery time due to his youth and strength — according to Rivera's doctor's testimony — and the likelihood that Ventura assisted with this grisly task. Therefore, Rivera's alibi is not a complete defense, and only calls into question the credibility of Coogle's testimony. *Percival,* 62 V.I. at 489 (holding "eyewitness identification is sufficient to support a conviction 'even if . . . contradicted by the accused or by alibi testimony.' " (quoting *Connor,* 59 V.I. at 290-91)). As stated above, we do not find Coogle's testimony to be inherently dubious such that we will reject it. Therefore, it was up to the jury to determine whether to believe Coogle's testimony or Rivera's alibi witnesses. Because we find that a reasonable jury could have concluded that Rivera murdered Williams or aided and abetted in Williams's murder, despite his recent surgery, we

affirm the Superior Court's denial of Rivera's motion for judgment of acquittal.

## C. Impartial Jury

Next, Rivera argues that he was deprived of his Sixth Amendment right to a fair trial when the Superior Court denied his request for a bench trial. Rivera waived his right to a jury trial during the second day of jury selection, on January 22, 2014, expressing concern over some of the prospective jurors' responses during voir dire. The court advised Rivera and his co-defendants that they would be required to waive their right to a jury trial in writing, which each defendant promptly did. The following day, when the court revisited the issue, the People objected to a bench trial and demanded a jury trial. The Superior Court proceeded to empanel a jury and, in a February 6, 2014 memorandum opinion, memorialized its decision denying Rivera's request for a bench trial, holding that it lacked the power to grant Rivera's motion once the People demanded a jury trial, pursuant to section 26 of the ROA.

### 1. Section 26 of the ROA

Section 26 of the ROA[9] — which previously conferred the substantive right to a jury trial on Virgin Islands residents — requires that the defendant affirmatively demand a jury trial, and absent such a demand, directs that the case be tried by the judge. 48 U.S.C. § 1616; *see Murrell v. People*, 54 V.I. 338, 350-51 (V.I. 2010). Section 26 also authorizes the government to demand a jury trial, or, if neither party demands a jury trial, authorizes the judge to *sua sponte* order a jury trial. *Id.* However, as part of the amendment of the ROA in 1968, Congress amended section 3,

---

[9] Section 26 of the ROA provides that:

> All criminal cases originating in the district court shall be tried by jury upon demand by the defendant or by the Government. If no jury is demanded the case shall be tried by the judge of the district court without a jury except that the judge may, on his own motion, order a jury for the trial of any criminal action. The legislature may provide for trial in misdemeanor cases by jury of six qualified persons.

*Murrell v. People*, 54 V.I. 338, 350-51 (V.I. 2010) (quoting The Revised Organic Act of 1954, § 26, 48 U.S.C. § 1616, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 159 (1995) (preceding V.I. CODE ANN. tit. 1)). Although section 26 refers explicitly to "cases originating in the district court" we have held that it also applies in criminal cases originating in local courts. *Id.*

48 U.S.C. § 1561, and extended the protections of the Sixth Amendment to the Constitution of the United States to the Virgin Islands, which affords defendants the right to a trial by jury in all criminal prosecutions for serious offenses. *Id.* at 354-55; *see also Powell v. People*, 59 V.I. 444, 452 n.5 (V.I. 2013). In *Murrell*, we held that the Sixth Amendment, and not section 26, conferred the substantive right to a jury trial on Virgin Islanders, and clarified that in the Virgin Islands, a "serious offense" is any crime where the statutory maximum punishment exceeds six months.[10] 54 V.I. at 359-60.

We also recognized that the adoption of the Sixth Amendment superseded any other statute to the extent that the two provisions were in conflict. *Id.* at 354 ("[T]he 1968 amendments to section 3 also provided that '[a]ll laws enacted by Congress with respect to the Virgin Islands . . . which are inconsistent with the provisions of this subsection are repealed to the extent of such inconsistency.'" (quoting 48 U.S.C. § 1561)). Applying this principle, we held that 14 V.I.C. § 4 — a statute providing that a judge could limit the term of imprisonment to six months in misdemeanor cases, and permitting such cases to be tried by the judge, "except in cases where a mandatory sentence is imposed" — conflicted with a defendant's Sixth Amendment right to a jury trial in all serious cases. *Id.* at 358-59. We recognized, however, that section 26 authorized the Virgin Islands legislature to provide for a six person jury in such cases. *Id.* at 360. In so doing, we effectively enforced section 26 to the extent that it was not in conflict with the Sixth Amendment. As the Superior Court properly explained, there is little in section 26 that is in conflict with the Sixth Amendment, observing that:

---

[10] In *Murrell*, we recognized the conflict between section 26 and the Sixth Amendment regarding the procedure by which a criminal defendant receives a jury trial. 54 V.I. at 363. The Sixth Amendment presumes that a criminal defendant prefers to be tried by a jury, and automatically attaches that right to the case, while section 26 requires a defendant to demand a jury trial, should one be desired. *Id.* Similar to *Murrell*, in this case, Rivera demanded a speedy trial by jury at his arraignment on February 29, 2012, and thus we need not decide in this case when the right to a speedy trial attaches. (J.A. 213.) But during jury selection, Rivera decided that he preferred a bench trial, to which the People objected and demanded a jury trial. Neither section 26 nor the Sixth Amendment provide a procedure for waiving a jury trial once the right had been granted. We decline to resolve whether Rivera's waiver was valid in this case because we agree with the Superior Court and hold that the People's demand for a jury trial required the court to hold a jury trial pursuant to section 26.

no legislative history behind the 1968 amendment reveals any congressional intent at odds with the literal terms of section 26. That is, nothing behind Congress amending section 3 to extend the Sixth Amendment to the Territory reveals any intent to revise, supersede, or repeal section 26 [of the ROA] as far [as] the prosecution's right to demand a jury trial, particularly given that the 1958 amendment underscored Congress's intent to make clear that section 26 extended the right to demand a jury trial to the government as well as the defendant. Therefore, because *Murrell* holds that section 26 applies in the Superior Court of the Virgin Islands, and because section 26 grants the government the right in criminal cases to demand a jury trial, it follows that that right also applies to criminal cases brought in the Superior Court by the People of the Virgin Islands.

*People v. Velasquez*, 62 V.I. 3, 13 (V.I. Super. Ct. 2014).

The Sixth Amendment only guarantees a jury trial in "serious" criminal cases. *Murrell*, 54 V.I. at 355 (citing *Lewis v. United States*, 518 U.S. 322, 325, 116 S. Ct. 2163, 135 L. Ed. 2d 590 (1996)). It does not afford a criminal defendant the opposite right: a trial by judge. *Singer v. United States*, 380 U.S. 24, 34-35, 85 S. Ct. 783, 13 L. Ed. 2d 630 (1965) ("The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."). Furthermore, the United States Supreme Court has upheld the validity of the principles set forth in Federal Rule of Criminal Procedure Rule 23(a), which conditions a criminal defendant's waiver of a jury trial on the consent of the prosecution[11] and the court.[12] *Adams v. United States*, 317 U.S. 269,

---

[11] The Supreme Court upheld the validity of Rule 23(a) based on the premise that a government prosecutor, as a civil servant, has two aims in charging cases: "that guilt shall not escape or innocence suffer." *Singer*, 380 U.S. at 37 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)). Based on this foundation and its confidence in the integrity of the government prosecutor, the Court would not "assume that federal prosecutors would demand a jury trial for an ignoble purpose." *Id.*

[12] The United States Supreme Court has clarified that this holding is applicable only in federal courts and that state courts are free to decide the question for themselves, and cites the different conditions under which various states permit a defendant's waiver. *Singer*, 380 U.S. at 36-37 (recognizing that some states "have made waiver contingent on approval by the prosecutor," and others "have made court approval a prerequisite for waiver," while "still others have provided that the question of waiver is a matter solely for the defendant's informed decision" (collecting cases)); *see Zigan v. State*, 281 Ga. 415, 638 S.E.2d 322, 324

277-78, 63 S. Ct. 236, 87 L. Ed. 268 (1942). In *Singer*, the United States Supreme Court reasoned that the "Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result." 380 U.S. at 36. By authorizing the government to demand a jury trial, section 26 reflects this same reasoning.

■ Thus, we hold that the provision of section 26 authorizing the People to demand a jury trial in criminal cases is in concert with the Sixth Amendment.[13] To borrow language from the United States Supreme Court, there is nothing unconstitutional about permitting the People to demand a jury trial when "the result is simply that the defendant is subject to an impartial trial by jury — the very thing that the Constitution guarantees him." *Singer*, 380 U.S. at 36. Furthermore, section 26 does not set out any rules as to when the demand must be made. And we conclude that in this case, the People's demand for a jury trial was timely made, despite the trial already having commenced, as it was in response to Rivera's belated attempt to waive his right to a jury trial. Therefore, we hold that the Superior Court correctly denied Rivera's motion for a bench trial upon receiving the People's demand for a trial by jury.[14]

---

(2006). Other states simply prohibit waiver of a jury trial in certain criminal cases. *See, e.g., People v. Cahill*, 2 N.Y.3d 14, 809 N.E.2d 561, 572, 777 N.Y.S.2d 332 (2003) ("Our State Constitution's ban on jury waivers in capital cases is long-standing and purposeful.")

[13] We have previously held that "the United States Constitution does not confer rights on the prosecution; rather, the right to due process belongs to criminal defendants." *Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279 (V.I. 2014) (citing *United States v. Thoms*, 684 F.3d 893, 902-03 (9th Cir. 2012)). But here, it is not a Constitutional due process right being granted to the People. Rather, section 26 is a Congressional statute which authorizes the People to demand that the court provide the defendant with his or her constitutionally guaranteed method of trial, albeit over the defendant's waiver of that right. Affording the People such power does not violate the defendant's right to due process. *Singer*, 380 U.S. at 36.

[14] There are multiple reasons a criminal defendant may prefer a bench trial over a jury trial:

For example, a defendant may have been the subject of intense media scrutiny, and the public may perceive him as unpopular or identify him with an unpopular cause. Moreover, a defendant may feel that the case raises factual and legal issues too complex for a jury. Additionally, a defendant who wants to testify at trial may be concerned that a jury would be unable to properly evaluate his prior criminal record. Finally, a defendant may simply want to save the time and expense of a jury trial.

## 2. Impartial Jury

Although the Superior Court properly granted the People's demand for a jury trial under section 26, it still had a duty to ensure that the jury selected to hear Rivera's case was impartial. *Browne v. People*, 56 V.I. 207, 238-39 (V.I. 2012) (recognizing that a change of venue may be necessary "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial" (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966)); *Singer*, 380 U.S. at 36 (leaving open the possibility that in rare situations a jury trial may ultimately be improper where the circumstances are such that the probability of selecting an impartial jury is low). Rivera does not argue that one or more jury members was actually biased against him, proof of which would certainly warrant a reversal. *See Rivera-Morena*, 61 V.I. at 320-21 (granting defendant habeas corpus relief because it was clear that a biased juror was empaneled). Instead, he argues that the prejudicial pretrial media attention generated by this case was so pervasive that it "inflamed [the] community atmosphere," to the extent that he was unlikely to be able to select a jury that did not have preconceived notions regarding his guilt. *Harris v. Pulley*, 885 F.2d 1354, 1362 (9th Cir. 1989) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963)).

In rare cases, courts have held that public interest in a case is so high that it is virtually impossible to select a jury that is not predisposed to find one way or another. *See, e.g., Rideau*, 373 U.S. at 726 (holding that the televised interview of defendant's detailed confession to robbery, kidnapping, and murder precluded the possibility of an impartial jury); *Irvin v. Dowd*, 366 U.S. 717, 727, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (vacating conviction and remanding case because of "the 'pattern of deep and bitter prejudice' shown to be present throughout the community was clearly reflected in the sum total of the voir dire examination of a majority

---

Adam H. Kurland, *Providing A Federal Criminal Defendant with A Unilateral Right to A Bench Trial: A Renewed Call to Amend Federal Rule of Criminal Procedure 23(a)*, 26 U.C. DAVIS L. REV. 309, 311-12 (1993). While the number of criminal defendants who wish to have their case tried by the judge instead of a jury may be relatively few, "these cases tend to be high profile, highly publicized, and often raise a plethora of difficult legal and factual issues." *Id.* at 313. Many of these circumstances are present in this case, and we question the People's decision to demand a jury trial, especially given its acknowledged lack of readiness to go forward with trial only a month before trial commenced.

of the jurors finally placed in the jury box") (citation omitted). Rivera, through counsel, requested a bench trial — as opposed to a change of venue which he determined was impractical given that jury selection had already commenced — citing various responses from prospective jury members that indicated their reluctance to sit on the jury in this particular trial as evidence that an impartial jury could not be culled from the venire. In denying Rivera's motion for a bench trial, the Superior Court noted that "none of the defendants through counsel sought to substantiate their reasons for believing that pretrial publicity would essentially result in them being denied the right to an impartial trial."[15] (J.A. 2436.) Jury selection was completed without further objection, and Rivera stated he was satisfied with the members of the jury, albeit while maintaining his objection to a jury trial. Significantly, Rivera, and his codefendants, failed to exhaust their peremptory challenges.[16] *Shedrick*, 482 N.Y.S.2d at 947-48 (holding that defendant's motion for a change of venue based on extensive media coverage that poisoned the jury pool was properly denied given that the "defendant failed to even exhaust his peremptory challenges"), *aff'd on other grounds*, 66 N.Y.2d 1015, 489 N.E.2d 1290, 499 N.Y.S.2d 388 (1985).

▮ After careful consideration, we conclude that in the present case the pre-trial media coverage did not create widespread community prejudice through highly sensationalistic reports to the extent that Rivera was unable to receive a fair jury trial in St. Croix. Although discussed within the context of a request for a change of venue — as opposed to a

---

[15] Although we agree with the Superior Court in that Rivera failed to support his argument with any meaningful case law, it is clear to us that he thought an impartial jury could not be culled from the jury pool, infringing on his right to a fair trial. It is the duty of the trial court to ensure that a defendant's constitutional rights are not violated, and when a defendant brings such an issue to the trial court's attention, it should be carefully addressed. *See e.g.*, *Woodrup v. People*, 63 V.I. 696, 712 (V.I. 2015) (reiterating the fact that "a party only needs to raise an issue in time for the Superior Court to address it and take whatever action is necessary in the first instance in order to fairly present the issue and preserve it for appeal." (quoting *Percival*, 62 V.I. at 486)); *Phipps v. People*, 54 V.I. 543, 548 (V.I. 2011) (applying 'plain error' standard in reversing conviction because incorrect jury instruction affected defendant's substantial rights and could adversely affect the integrity of the judicial proceedings).

[16] The record indicates that the defendants did not use the additional three peremptory challenges made available to them for use in determining the six alternate jurors. (J.A. 1009.) However, the record does not indicate how many, out of ten, peremptory challenges the defendants used in selecting the twelve empaneled jurors.

request for a bench trial — the United States Supreme Court, in *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), relied on multiple factors to determine whether the jury selected to hear a case regarding a defendant's alleged involvement in a mega-corporation's scheme to deceive the investing public was prejudicially biased against the defendant. *Id.* at 381-82 (affirming trial court's decision to deny defendant's change of venue motion in case regarding Enron scandal). We hold that analysis of potential juror prejudice in cases such as this should be made in light of the factors identified in *Skilling*, and where it is determined that the prospective jury pool is too tainted by the volume of pretrial publicity that infringes on the defendant's due process rights, a motion demanding a bench trial — as opposed to a change in venue — may be an adequate remedy.[17] *See United States v. Stanford*, 589 F.2d 285, 299 (7th Cir. 1978) (rejecting defendants' claims that they "were forced to forego a jury trial because of publicity" where they never requested a jury trial or a change in venue, and holding that it was not "persuaded that the publicity here was so egregious that it would taint a fairly conducted bench trial"); *Hirschkop v. Snead*, 594 F.2d 356, 371 (4th Cir. 1979) ("Pretrial publicity has not been shown to be a source of interference to fair bench trials."). But first, the defendant must show that it is unlikely an impartial jury can be selected.

In *Skilling*, the Supreme Court looked at multiple factors when determining whether the defendant had received a fair trial.[18] It

---

[17] We note that since we have held that section 26 authorizes the People to demand a jury trial, a change in venue may be the only procedure available to a defendant who believes an impartial jury cannot be culled from the venire. However, a defendant's constitutional right to a fair trial takes precedence over the People's desire for a jury trial, and when the circumstances indicate that a change in venue would not result in the ability to select an impartial jury, given this jurisdiction's limited trial court options, a bench trial may be the best remedy.

[18] Some courts have adopted their own factors, in addition to the *Skilling* factors. *See, e.g.*, *State v. Hudgins*, 301 Kan. 629, 346 P.3d 1062, 1072-73 (2015) (outlining the nine factors it considers in a change of venue motion due to media publicity: "(1) the degree of publicity circulated through the community; (2) the degree the publicity circulated through areas to which venue could be changed; (3) the length of time from the dissemination of the publicity to the trial date; (4) the care exercised and ease encountered in jury selection; (5) the familiarity with publicity and its resultant effects upon prospective jurors or trial jurors; (6) challenges exercised by the defendant in jury selection, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the prospective jurors are drawn.") (citing *State v. Roeder*, 300 Kan. 901, 336 P.3d 831 (2014)).

considered (1) the "size and characteristics of the community in which the crime occurred," (2) the extent of the media coverage surrounding the case and whether the stories contained a confession or "other blatantly prejudicial information of the type readers or viewers could not reasonable be expected to shut from sight," (3) the amount of elapsed time between the alleged conduct and trial, and (4) the jury verdict, and whether it acquitted or found the defendant not guilty of any counts, implying that it was not predisposed to a finding of guilt, no matter the evidence. 561 U.S. at 382-83.

In this case, we first note that no evidence of the pretrial publicity was presented to the trial court. *See Henry v. Dennery*, 55 V.I. 986, 994 (V.I. 2011) ("[U]nsworn representations of an attorney are not evidence."). Assuming that the representations Rivera's counsel made were true, and that there was unfavorable media coverage about the defendants, we cannot conclude that it was so invasive that it invaded the courtroom, and disrupted the trial process or influenced the jury. *See Estes v. Texas*, 381 U.S. 532, 536, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (holding defendant's rights were violated where the public media overtook the courtroom during a pretrial hearing, disrupting the "judicial serenity and calm to which [a defendant is] entitled"); *Sheppard*, 384 U.S. at 354-55. Furthermore, Rivera's counsel does not liken this case to *Rideau*, where the community "had been exposed repeatedly and in depth to the spectacle of [the defendant] personally confessing in detail to the crimes with which he was later to be charged" and turning "subsequent court proceedings in a community so pervasively exposed to such a spectacle" into "a hollow formality." 373 U.S. at 726. Neither Rivera, nor any of his co-defendants, confessed to the crimes with which they were charged. *See United States v. Chagra*, 669 F.2d 241, 251-52, n.11 (5th Cir. 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.")). Rivera's counsel represents that the media portrayed Rivera and his co-defendants as "mass murderers" who necessitated impressive security at the courthouse during trial to keep the public safe. (J.A. 710-11.) Admittedly, news reports that Rivera was on trial for murdering a police officer with saws and disposing of his body are the type of allegations that inflame public sentiment, but "[n]o evidence of the smoking-gun variety invited prejudgment of [Rivera's] culpability." *Skilling*, 561 U.S. at 383.

Unquestionably, St. Croix is a small jurisdiction with a small population from which to select a jury. *See Hayes*, 632 F.3d at 509 (noting that the small size of the county in that case — 190,000 people — weighed in favor of defendant's prejudicial publicity claim). And although some of the veniremen were excused due to their prejudice against defendant based on outside information regarding the case, this does not demonstrate that all veniremen were biased. *Murphy v. Florida*, 421 U.S. 794, 803, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (holding that even where 20 out of 78 potential jurors were excused because they indicated they had a predisposition of defendant's guilt, this "by no means suggests a community with sentiment so poisoned against [a defendant] as to impeach the indifference of jurors who displayed no animus of their own"); *Hayes*, 632 F.3d at 512 (holding motion for a change of venue was properly denied because the defendant "suffered no presumed or actual prejudice" due to pretrial publicity); *Brown v. State*, No. 60082, 2013 Nev. Unpub. LEXIS 1470, at *3 (Nev. Sept. 26, 2013) (unpublished) (finding no abuse of discretion where some jurors had seen media reports previously but there was "no evidence that any of the selected jurors had preconceived notions that they were unable to set aside").

Given our position as an appellate court, we are hesitant to engage in "after-the-fact assessments of the media's impact on jurors" or to second-guess the trial court's "on-the-spot comprehension of the situation." *Skilling*, 561 U.S. at 386. We are confident that the Superior Court fulfilled its duty to ensure that the jury was impartial by conducting an extensive and complete *voir dire* of the possible jurors. *United States v. Reyes*, 8 F.3d 1379, 1390 (9th Cir. 1993) ("The 'passion, prejudice . . . and public feeling' defendant feared would jeopardize his right to an impartial trial, were specifically addressed and guarded against by the trial judge during voir dire." (quoting *Singer*, 380 U.S. at 38)). Jury selection lasted multiple days and the record indicates that the judge engaged — with the assistance of counsel — in a thorough vetting of the potential jurors. Notably, Rivera failed to exhaust all of his peremptory challenges and expressed his satisfaction with the empaneled jury, albeit while maintaining his preference for a bench trial. Finally, we find it highly persuasive that the jury found one of Rivera's co-defendants not guilty of murder, which clearly implies that it was not predisposed to find Rivera guilty regardless of the evidence. *See Skilling*, 561 U.S. at 383. Confident that the *voir dire* conducted by the Superior Court was sufficient to excuse

any potential juror that had already determined Rivera's guilt based on media reports or other outside information, we conclude that the Superior Court properly safeguarded Rivera's right to an impartial jury.

## D. Undue Pre-Charging Delay

Next, Rivera argues that his Fifth Amendment right to due process was violated by the People's undue ten-year pre-charging delay. Rivera asserts that "the government exacerbated the impact of its delay by intentionally depriving [him] of warning, for example, via an interview or subject/target letter" informing him that he was a suspect in Williams's disappearance investigation. According to Rivera, this "prevented [him] from marshaling and preserving other information crucial for his criminal defense." (*Id.*) The People defended the delay in bringing charges by pointing to the VIPD's obligation to have probable cause before effectuating an arrest, which allegedly they did not develop until the VIPD substantiated Coogle's claims in June 2011, when they found what they believed to be physical evidence of a killing that conformed to Coogle's story.

In a November 5, 2013 order and opinion, the Superior Court denied Rivera's motion to dismiss. The court employed a two pronged test: "whether '[the] delay . . . caused substantial prejudice to [a defendant's] rights to a fair trial' and whether 'the delay was an intentional device to gain tactical advantage over the accused.' " *People v. Velasquez*, 59 V.I. 197, 205 (V.I. Super. Ct. 2013) (unpublished) (quoting *United States v. Marion*, 404 U.S. 307, 324, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)). The court determined that Rivera failed to prove any prejudice, and only argued that "had he been made aware of the impending charges, 'he might have had a chance to investigate where he was and who he was with at the time.' " *Velasquez*, 59 V.I. at 207 (quoting Rivera's Motion to Dismiss, at 5). The court held that Rivera failed to "demonstrate[ ] one concrete instance where the People's pre-charging delay actually prejudiced [him]" and that without "proof of actual prejudice, a due process claim is not ripe for adjudication." *Id.* (citing *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)). The court went on to find that there was no evidence that the People delayed prosecution in bad faith to gain a tactical advantage. *Id.* Instead, it determined that the People re-opened the case after physical evidence was discovered that corroborated an eyewitness's account of the murder, and that generally, "a

prosecutor exercises sound professional judgment by waiting to prosecute a defendant until sufficient evidence exists to prove a Defendant guilty beyond a reasonable doubt." *Id.*

Whether a lengthy pre-charging delay violates the Fifth Amendment's right to Due Process necessitating a dismissal is an issue of first impression before this Court. We have already recognized that the Fifth Amendment of the United States Constitution, applicable in the Virgin Islands pursuant to section 3 of the ROA, guarantees due process in all court proceedings. *Simmonds v. People*, 59 V.I. 480, 491 (V.I. 2013) (Congress intended for "the Fifth Amendment to have the same effect in the Virgin Islands as it does in the states"). The Due Process Clause "always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *Doggett v. United States*, 505 U.S. 647, 666, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992).

The United States Supreme Court first held that due process may be violated when the government delays too long in bringing charges against a defendant in *Marion*, 404 U.S. at 324. The Supreme Court established that the dismissal of an indictment may be required "if it were shown at trial that the pre-indictment delay in [the] case caused substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.* In making such a determination, the Supreme Court advised that courts must engage in "a delicate judgment based on the circumstance of each case" to "accommodate the sound administration of justice." *Id.* at 325. In *Marion*, the Court relied on the defendants' failure to prove that a 38-month pre-charging delay caused actual prejudice to their defense and the lack of any evidence that the government intentionally delayed its actions to gain a tactical advantage or harass the defendants in concluding there was insufficient evidence to support a constitutional due process claim. *Id.* at 325-26.

The Supreme Court considered the issue again in *Lovasco*, 431 U.S. at 795 n.17, where the Court held that pre-indictment delay rises to the level of a constitutional violation when the defendant can show substantial prejudice caused either by the government's intentional delay in bringing the case to gain a tactical advantage or by its "reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco* makes clear that a constitutional violation occurs when

the defendant suffers substantial prejudice caused by the delay and the government's reasons for the delay are inadequate justification. *Id.* at 789 (holding that while "proof of actual prejudice makes a due process claim concrete and ripe for adjudication, [it does not make] the claim automatically valid"). The Supreme Court cautioned that judges were not permitted "to impose on law enforcement officials [their] 'personal and private notions' of fairness or to 'disregard the limits that bind judges in their judicial function.' " *Id.* at 790 (quoting *Rochin v. California*, 342 U.S. 165, 170, 72 S. Ct. 205, 96 L. Ed. 183 (1952)). Instead, when evaluating whether a pre-charging delay violates due process, the court must consider whether the government's delay in bringing charges "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.' " *Lovasco*, 431 U.S. at 790 (citations omitted).

These two cases created a circuit split among the federal courts of appeals on the proper standard for evaluating a pre-indictment due process claim. Michael J. Cleary, *Pre-Indictment Delay: Establishing A Fairer Approach Based on* United States v. Marion *and* United States v. Lovasco, 78 TEMP. L. REV. 1049, 1059 (2005). "The majority of the circuits place the burden on the defendant to satisfy a two-pronged test by proving: (1) actual prejudice as a result of the delay, and (2) intentional delay by the government in an attempt to win tactical advantage in the defendant's prosecution." *Id.* at 1051-52. The minority approach[19] uses a balancing test, where once the defendant proves actual and substantial prejudice, the burden shifts to the government to provide a reason for the delay. *Id.* at 1052. The court must engage in a balancing analysis to determine whether "requiring the defendant to stand trial violates 'fundamental conceptions of justice' and 'the community's sense of fair

---

[19] The Fourth, Seventh, and Ninth Circuits all adopt this approach. *See* Cleary, 78 TEMP. L. REV. at 1052 n.26; *see, e.g., United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007) (holding defendant must prove "actual, non-speculative prejudice from the delay" and that "the length of the delay is weighed against the reasons for the delay," which when balanced together "offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' ") (citations and some internal quotation marks omitted); *United States v. Sowa*, 34 F.3d 447, 451 (7th Cir.1994) (holding that once defendant proves actual and substantial prejudice, court will balance prejudice against the reasons provided by the government for the delay); *Howell v. Barker*, 904 F.2d 889, 895-96 (4th Cir.1990) (same).

play and decency.' " *Id.* at 1052 (quoting *Lovasco*, 431 U.S. at 790); *see United States v. Gross*, 165 F. Supp. 2d 372, 378 (E.D.N.Y. 2001) (holding that once the defendant can demonstrate prejudice, the court must consider the government's explanation for the delay).

Few Virgin Islands cases — and only those in the federal system — have ever addressed whether a defendant's due process rights have been violated by pre-indictment delay. It appears that the District Court of the Virgin Islands uses the minority test when considering the issue,[20] by requiring the government to justify the delay once the defendant has presented some evidence of actual prejudice. *See United States v. Gross*, 41 V.I. 463, 472 (D.V.I. 1999) (unpublished) (holding that "[n]o real, substantial prejudice to the defendant is apparent, so the Court will not ask the government to justify the delay"); *Gov't of V.I. v. Moncayo*, 31 V.I. 135, 141 (D.V.I. 1993) (unpublished) (questioning whether "the delay in returning formal charges [was] intentional, demonstrating a total lack of diligence or for some other improper reason" and concluding no due process violation where delay was largely attributed to the defendant's evasion of process by the courts). In its most recent case discussing the issue, the District Court seemingly endorsed the minority test when it held that "if the defendant suffers actual prejudice, the court must consider the Government's reasons for the delay and whether the length of the delay, when balanced against the reasons for the delay, violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Pereira v. Gov't of V.I.*, Crim. No. 2003/035, 2008 U.S. Dist. LEXIS 107630, at *12 (D.V.I. Feb. 27, 2008), *aff'd*, 302 Fed. Appx. 72 (3d Cir. 2008) (internal citations and quotation marks omitted).

The District Court discussed its endorsement of the minority test in *United States v. Benjamin*, 816 F. Supp. 373, 28 V.I. 133 (D.V.I. 1993)

---

[20] Although the District Court of the Virgin Islands appears to follow the minority approach, the Third Circuit has clearly stated, and recently reiterated, that it follows the majority rule requiring the defendant to prove both actual prejudice and that the government delayed bringing charges with the intention of gaining some tactical advantage. *United States v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987) (holding that "a defendant must bear the burden of proving two essential facts: (1) that the government intentionally delayed bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual prejudice"); *United States v. Staton*, 605 Fed. Appx. 110, 113 (3d Cir. 2015) (same).

(the court also held there were other reasons for the dismissal, given that dismissal for pre-indictment delay is "looked upon with disapproval"). *Id.* at 381. In *Benjamin*, the government delayed in bringing charges against the defendant for three years after the last date the alleged conduct took place. *Id.* at 376. In his motion to dismiss for pre-indictment delay, the defendant contended that tape recordings of his interviews with the witnesses would have countered the allegations made against him by the alleged victims. *Id.* at 379. The government admitted it had never examined the tapes, and the defendant argued that had the government been "more diligent in its investigation of the matter he would have sought to preserve the tapes for his defense." *Id.* Instead, the tapes were destroyed during Hurricane Hugo on September 17, 1989. *Id.* at 380. The government defended its inaction by arguing that "it was under no legal requirement, 'statutory, common-law or Constitution[al]' to complete its investigation in a diligent manner that would minimize delay." *Id.*

The court determined that the Government's treatment of the case was "negligent and lackadaisical" and that it knew of the defendant's criminal conduct more than two years before Hugo struck, that it "had obtained the bulk of the evidence it would acquire to establish [the defendant's] guilt," and that it had taken witness statements but delayed in interviewing the accused. *Id.* It applied the two pronged *Lovasco* test, noting that each prong involved a double inquiry: (1) "whether the defendant has proved actual prejudice, and whether the prejudice is substantial, that is, the prejudice to the defense must meaningfully impair the accused's ability to defend himself," and (2) "whether the length of the delay, when balanced against the [government's] reasons for the delay, 'violates those fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Benjamin*, 816 F. Supp. at 379 (quoting *Lovasco*, 431 U.S. at 790). The court relied on the then-recent United States Supreme Court decision *Doggett* to hold that where "actual prejudice is sufficiently proved and negligence has resulted in unreasonable delay not persuasively rebutted" the defendant is entitled to relief. *Benjamin*, 816 F. Supp. at 381. The court found persuasive language used in *Doggett* that discusses a Sixth Amendment post-indictment delay in prosecution:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make re-

574

lief automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.

*Id.* at 381 (quoting *Doggett*, 505 U.S. at 656-57). The court went on to hold that the defendant had "demonstrated substantial prejudice to his defense as a result of the pre-indictment delay" and, although there appeared to be some evidence that the government delayed the case to amass evidence against another person, it would not tolerate lengthy indefensible delays. *Id.* (citing *Doggett*, 505 U.S. at 657 ("Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority.").

 We observe at the outset that in *Benjamin*, the District Court applied United States Supreme Court reasoning in a Sixth Amendment undue delay case to a Fifth Amendment undue delay case. And we recognize that the rights sought to be protected under each Amendment differ and that the tests courts use to determine whether there has been a violation are distinct.[21] Thus, prejudice due to pre-indictment delay does not factor into a Sixth Amendment speedy trial analysis, and vice versa. *See, e.g., United States v. Jones*, 592 Fed. Appx. 920, 921 (11th Cir. 2015) (holding the death of a witness that occurred *before* defendant's indictment is not implicated in a post-indictment speedy trial analysis but should only be considered when discussing pre-indictment delay). Nonetheless, we agree with the *Benjamin* court and conclude that the minority test is the most logical and fair application of the United States Supreme Court precedent, and that the reasoning behind the *Doggett* decision is applicable to a pre-indictment delay allegation. Both the Fifth and the Sixth Amendment strive to protect an individual's ability to defendant himself against charges brought by the state, and to the extent

---

[21] Both the Fifth and Sixth Amendments protect individuals from governmental delay in trying individuals for crimes. The Fifth Amendment right to due process protects a defendant from prejudice to his or her defense as a result of unjustified pre-indictment delay. Cleary, 78 TEMP. L. REV. at 1055. The Sixth Amendment right to a speedy trial is "designed to prevent 'undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself.' " *Id.*; *Francis v. People*, 63 V.I. 724, 744-745 (2015).

that ability is hampered by the government's delay, whether pre- or post-information, the government should be required to provide some reasoning justifying its inaction. As the Seventh Circuit aptly pointed out, "[t]his procedure is commanded not only by precedent, but by logic. Once the defendant has cleared the monumental hurdle of proving prejudice, the government should explain its reasons. How else is the defendant to know why the government waited so long to indict him?" *United States v. Sowa*, 34 F.3d 447, 451 (7th Cir. 1994). We question the fairness of the majority's position requiring that the defendant bear the burden of proving the government delayed the case with the intent to gain a tactical advantage and whether such a burden could ever be met. *See* Cleary, 78 TEMP. L. REV. at 1073 (discussing the tremendous difficulty defendants would have in proving intentional delay by the government and that the majority test "does not contemplate the difficulty defendants either have encountered or will encounter in attempting to prove improper prosecutorial motive" (quoting *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990)).

 Therefore, we hold that once a defendant has proved substantial prejudice to his defense, the government must justify its delay, and this explanation will be balanced against the prejudice the defendant suffered due to the delay to determine whether a violation of justice has occurred. In so doing, we recognize the Territory's right to investigate and prosecute cases according to its own agenda and ability, and that it has limited resources and must prioritize the cases it pursues. We only caution against misuse of its time and agenda to the extent that an unreasonable delay violates a criminal defendant's Constitutional right to due process.

 Turning our attention to the facts of the case before us, we first must determine whether Rivera has proved that he suffered actual prejudice. *See Lovasco*, 431 U.S. at 789. *See, e.g., United States v. Sample*, 565 F. Supp. 1166, 1177 (E.D. Va. 1983) (dismissing case where defendants proved the death of a witness "resulted in actual and substantial prejudice to the defendants' defense and that the actual and substantial prejudice to the defendants from the death of [the witness] is directly attributable to eleven months of unjustified and wholly unnecessary governmental inaction"). The defendant must prove something more than general prejudice, such as a risk of lost evidence or faded memories. *Marion*, 404 U.S. at 325-26 (holding there was no constitutional violation where charges were brought within the applicable

576

statute of limitations and defendants relied "solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost"); *see Doggett*, 505 U.S. at 655-56 (citing *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986)); *State v. Krizan-Wilson*, 354 S.W.3d 808, 820 (Tex. Crim. App. 2011) (holding that any inherent prejudice in any extended delay is not enough by itself to justify the dismissal of an indictment). Instead, the defendant must prove he suffered substantial prejudice that affects his ability to mount a proper defense. *Benjamin*, 816 F. Supp. at 379.

In a factually similar Texas case — a state that evaluates pre-indictment due process violations under the majority test — charges were brought against a defendant 23 years after the crime was committed. *Krizan-Wilson*, 354 S.W.3d at 811.[22] The defendant in *Krizan-Wilson* was charged with murdering her husband in 1985. After the crime was committed, a full investigation took place, but the police determined they did not have enough evidence to charge the defendant with murder, and instead charged her with bigamy. *Id.* at 811. The charge was eventually

---

[22] Texas determined that it would follow the Fifth Circuit's bright-line test for determining a pre-indictment due process violation as explained in *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996). The Fifth Circuit originally endorsed the minority rule balancing the two prongs, but in *Crouch*, the Fifth Circuit held that "where an indictment is returned within the statute of limitations, pre-indictment delay does not violate due process unless that delay, in addition to prejudicing the accused, was intentionally brought about by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose." *Krizan-Wilson*, 354 S.W.3d at 814 (quoting *Crouch*, 84 F.3d at 1523); *see Ibarra v. State*, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999) (holding that the nine and a half year delay between when the murder occurred and the date the defendant was indicted a second time, did not violate the defendant's right to due process, since murder has no statute of limitations, there was no evidence the state intentionally delayed the case to gain a tactical advantage or otherwise acted in bad faith, and the revived investigation began after evidence became accessible pursuant to statutory changes). The court also recognized that its prior case law left open the possibility that the state may have committed a due process violation by acting in bad faith, but did not clarify what might constitute bad faith. *Krizan-Wilson*, 354 S.W.3d at 817 (referring to "an intentional delay was designed to give the state a tactical advantage"). *See Crouch*, 84 F.3d at 1499, 1510-14 (after several pages of discussion, referring only to "some bad faith or improper purpose on the part of the prosecution," and efforts "by the prosecution to gain a tactical advantage over the defendant or for some other bad faith purpose.").

dropped.[23] *Id.* In 2007, a cold case unit began investigating the crime. *Id.* Importantly, no new evidence was discovered, but the district attorney's office decided that the prior prosecutor was laboring under a misunderstanding of the law and that there was sufficient evidence to bring the case before a grand jury. *Id.* The defendant was indicted on first-degree murder charges. *Id.*

After an evidentiary hearing on the *Krizan-Wilson* defendant's motion to dismiss, the trial court made findings of fact and conclusions of law holding that the long delay caused substantial prejudice to the defendant's ability to properly defend herself, meeting the first prong of the test. *Id.* at 817; *see State v. Krizan-Wilson*, 321 S.W.3d 619, 622-23 (Tex. Ct. App. 2010). Among the evidence presented at the hearing was the fact that medical records had gone missing, the defendant's memory had greatly deteriorated over the years, and that the lawyer she hired to represent her in 1985 had died and his case file and the physical evidence he had sent to a lab for testing could not be found. *Krizan-Wilson*, 354 S.W.3d at 811-12. Also, multiple witnesses had died or could not be found, including neighbors, co-workers, and the defendant's former forensic expert. *Id.* at 812, 817.

On appeal, the court held that "there is no evidence in the record that the prosecutorial delay was intended to gain a tactical advantage over [the defendant] or for another improper purpose" and the only reason for the delay was "a difference in opinions between the original prosecution team and other prosecutors 23 years later." *Id.* at 816. The court clarified that "[i]t is not enough for [the defendant] to argue that the trial court may have disbelieved each and every witness that testified that the state had no negative intentions for the delay, [she] must still present positive proof of such an improper purpose." *Id.* (citing *Janecka v. State*, 937 S.W.2d 456, 471-72 (Tex. Crim. App. 1996). In so holding, the court reasoned that the government has no duty to "conduct a continuous investigation," or "to file charges as soon as probable cause exists but before [it is] satisfied [it] will be able to establish the suspect's guilt beyond a reasonable doubt."

---

[23] There is a significant difference between the two cases with regard to whether the defendant was on notice he or she was a suspect to the crime. In *Krizan-Wilson* the defendant was clearly on notice that the police suspected her of murder, and she had the opportunity to preserve evidence to support her defense. In this case, Rivera had no notice that he was a suspect in Williams's death, and thus, had no opportunity to preserve evidence in support of his defense.

*Id.* at 818-19 (citations omitted). It relied on the reasoning found in *Lovasco*, that such a requirement — or even a requirement that prosecutors file public charges upon obtaining enough evidence to prove guilt beyond a reasonable doubt — "would cause injurious societal harms to the rights of the accused, law enforcement, prosecutors, and the judicial system." *Id.* at 819 (citing *Lovasco*, 431 U.S. at 791-92). The court acknowledged that "a 23-year, non-investigative pre-indictment delay, during which no new evidence is obtained," might be cause for closer scrutiny over "a similar delay for investigatory purposes." *Id.* at 819-20. But it ultimately concluded that for the crime of murder "the Texas legislature has intentionally chosen not to define a statute of limitations, explicitly allowing prosecutors to indict suspected murderers when they are ready to do so, and has determined that any such delay, without more, does not offend the community's sense of fair play and decency." *Id.* at 820.

Like the court in *Krizan-Wilson*, we agree that a ten year delay in prosecuting a murder where no substantial new evidence has been found requires close scrutiny. Unlike the circumstances in *Krizan-Wilson*, we find that Rivera has failed to prove that his defense was substantially prejudiced by the delay. There was no evidentiary hearing regarding prejudice and Rivera only submits that he suffered prejudice due to the potential loss of witnesses and the possible loss of documentation placing Coogle in Florida at the time of the crime. We recognize that he had no notice that he was a suspect in Williams's murder investigation and may have had a more difficult time producing evidence in his defense. But unfortunately, he does not even allude to who the witnesses would have been or what they would have testified to that would tend to support his defense that he did not murder Williams. *See United States v. Corona-Verbera*, 509 F.3d 1105, 1113 (9th Cir. 2007) (holding that defendant failed to prove prejudice by the loss of his witnesses where he failed "to make a specific showing" as to what the witnesses would have said). And while any potential documentation placing Coogle in Florida at the time of the crime — such as flight manifests, work records, or doctor's appointments — could have strengthened Rivera's attack on Coogle's credibility, he presents no evidence of his failed attempts to secure such documentation. We also note that such documentation would not necessarily support Rivera's innocence. At best, it would have strengthened his attack on Coogle's credibility and her assertion she was

in St. Croix at the time of the murder. *See id.* (holding "the mere absence of records is not enough to establish actual prejudice"). Nevertheless, Rivera presented testimonial evidence of Coogle's whereabouts to the jury, which chose to believe that Coogle witnessed Williams's murder.

 Even so, we do not doubt that Rivera suffered *some* prejudice caused by the delay. But frequently, a defendant is protected from general prejudice due to delay by a statute of limitations, which is "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Marion*, 404 U.S. at 323. The Virgin Islands Legislature has determined that in cases of first-degree murder, there is no statute of limitations, clearly prioritizing the Territory's interest in seeking justice for a murder victim over the general prejudice a defendant might suffer from the passage of time before trial. *See id.* at 322 ("Possible prejudice is inherent in any delay, however short; it may also weaken the Government's case."); *see Francis v. People*, 63 V.I. 724, 754 (V.I. 2015) (holding — within the context of a Sixth Amendment speedy trial violation analysis — that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify" (quoting *Doggett*, 505 U.S. at 655)). Statutes of limitations "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *Marion*, 404 U.S. at 322. Where, as here, there is no statute of limitations — or where a defendant brings such a claim when a crime has been charged within the statute of limitations — the defendant must prove actual, substantial prejudice to his defense caused by the delay to prove his Due Process violation claim. *Id.* at 324-25; *United States v. MacDonald*, 456 U.S. 1, 7, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982). Thus, because Rivera has not proven substantial prejudice caused by the delay, and any presumed prejudice he may have suffered is insufficient to support an undue pre-charging delay violation, we need not examine the government's reason for the delay.[24]

---

[24] We note, however, that the government's reason — that it did not have probable cause until it substantiated Coogle's claims in June 2011 — is a poor excuse, given that it had all of the information necessary to find the corroborating evidence in 2002, had it done a better job of

## E. Speedy Trial

Although Rivera, through counsel, raised concerns about his right to a speedy trial — a right granted to him under the Sixth Amendment of the United States Constitution and applicable in the Virgin Islands pursuant to section 3 of the ROA, *Francis*, 63 V.I. at 743-744 — it appears he never formally requested that the Superior Court dismiss the case due to a violation of his right to a speedy trial. At a May 25, 2013 hearing, Rivera's attorney represented to the Superior Court that he had a "speedy trial motion that has to do with post-charging delay" but if indeed it was filed and considered by the court, it was not included in the joint appendix, a search of the Superior Court docket failed to turn up any motion that could be construed as a post-indictment speedy trial argument, and the Superior Court did not issue a written decision on the issue. Instead in its November 5, 2014 memorandum opinion, the Superior Court noted that Rivera did not raise a Sixth Amendment speedy trial argument, and instead elected to focus exclusively on Fifth Amendment due process concerns. At best, Rivera, through counsel, indicated at a December 5, 2013 conference that if the trial did not go forward as scheduled on January 21, 2014, then the Court should dismiss the matter completely, or at the very least, it should grant Rivera bail until trial commences. But trial did commence on January 21, 2014, and no more discussion of a speedy trial was entertained by the court.[25]

---

investing the Grapetree area. Nonetheless, Rivera has not proven substantial prejudice due to the delay and we affirm the Superior Court's denial of his motion to dismiss.

[25] Although Rivera did not file a motion, supported by case law, to dismiss the case for a speedy trial violation, he made it clear at the December 5, 2013 conference that he thought his right to a speedy trial was being infringed upon. Tr. Trans. Dec. 5, 2013 ("Our position is on behalf of Mr. Rivera, who has been rotting in jail for the last two years while the Government tries to find somebody to try this case, our position is that it must be dismissed or go to trial on January 20.") Clearly, then, the Superior Court was aware that Rivera had raised the issue of a violation of his constitutional right to a speedy trial, and the court had a duty to ensure this right was not violated. *See e.g.*, *Woodrup*, 63 V.I. at 712 (reiterating the fact that "a party only needs to raise an issue in time for the Superior Court to address it and take whatever action is necessary in the first instance in order to fairly present the issue and preserve it for appeal" (quoting *Percival*, 62 V.I. at 486)). However, because Rivera never demanded that the Superior Court dismiss the case for a speedy trial violation and because trial commenced in January 2014 as agreed upon by the parties, we review Rivera's speedy trial claim only for plain error. "Under plain error review, there must be an error, that was plain, that affected the defendant's substantial rights." *Woodrup*, 63 V.I. at 720 (quoting *Webster*, 60 V.I. at 672). "Even then, this Court will only reverse where the error seriously affects the

■ The right to a speedy trial attaches at the time of an arrest or formal charge and protects "the rights of the defendant which may be hampered by undue and oppressive incarceration prior to trial, anxiety and concern accompanying public accusation, and the possibility that a long delay will impair the ability of an accused to present a defense." *Francis*, 63 V.I. at 744 (citing *Carty*, 56 V.I. at 361). A court evaluating a speedy trial violation must take into consideration four factors: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his rights; and (4) prejudice to the defendant." *Id.* at 744 (quoting *Carty*, 56 V.I. at 364 (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972))). The most important factor to evaluate is whether the defendant suffered prejudice from the delay. *Brown*, 55 V.I. at 504.

First, a delay of approximately 23 months is sufficient to trigger evaluation of the three remaining *Barker* factors. The longer the delay, the more "presumptively prejudicial" the delay is considered and weighs in favor of the defendant. *Doggett*, 505 U.S. at 651-52. We have previously recognized that a delay over 12 months "is presumed to be sufficiently prejudicial to require evaluation of the three remaining factors." *Carty*, 56 V.I. at 365 (citation omitted); *Brown*, 55 V.I. at 503 (holding Superior Court correctly proceeded to examine the remaining factors where delay was greater than one year). Thus, a delay of 23 months easily passes this threshold.

Next, we look at which party is responsible for the delay and why. Delays attributed to the People weigh in favor of a defendant's speedy trial claim, while delays attributed to the defendant do not. *Francis*, 63 V.I. at 748 (citing *Vermont v. Brillon*, 556 U.S. 81, 82, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009), and *Doggett*, 505 U.S. at 651).

Rivera was arrested on February 10, 2012, and was incarcerated until his trial in January 2014. Besides discovery motions, there was no

---

fairness, integrity, or public reputation of judicial proceedings." *Id.* A violation of a defendant's right to a speedy trial affects a substantial right that may seriously affect the fairness of the judicial proceeding. *See e.g.*, *Klopfer v. State of N.C.*, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967) (holding "the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment"); *United States v. Reagan*, 725 F.3d 471, 487 (5th Cir. 2013) (same); *United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008) (reviewing constitutional speedy trial claim for plain error); *Dora v. State*, 986 So. 2d 917, 925 (Miss. 2008) (same).

movement in the case for almost a year until January 2013, when the court *sua sponte* entered an order scheduling a calendar call for May 24, 2013, and ordered that all discovery be completed by April 8, 2013. In March 2013, Rivera filed a motion to set trial for a date certain, and the People requested a continuance to produce discovery due to its need to review, redact, and process voluminous materials, admitting it had not released "much of the relevant discovery." (J.A. 62; 2443-44.) One of Rivera's co-defendants also requested an extension of the timeline for discovery. At the May 24, 2013 calendar call, the Superior Court granted, over Rivera's opposition, the People's motion to extend discovery until July 31, 2013, and set jury selection to begin on November 12, 2013, which was memorialized in an August 19, 2013 order. Rivera agreed to the November trial date, but put on record his request for an earlier date.

In mid-July, the prosecutor for the People moved the Superior Court to permit him to withdraw from the case, explaining that his employment with the Virgin Islands Department of Justice would soon be ending, which was granted on September 20, 2013. Then, on August 22, 2013, the People filed a motion to continue the trial date, explaining that its case agent and lead detective would be out of the Territory for November 2013. Rivera vehemently opposed this motion, arguing that, by this time, he had been incarcerated for 19 months, that trial had been scheduled in May 2013, and that the request was "but another incident in the Government's unconscionable pattern of neglect at the expense of the accused." (J.A. 104-106.) Rivera requested that the court dismiss the charges for want of prosecution or order the trial proceed as scheduled. Nevertheless, on September 20, 2013, the Superior Court granted the People's motion and continued the trial to January 21, 2014, but admonished the People for the delay, given that the date had been scheduled well in advance. The Superior Court also expressed its concern that the People had not entered an appearance in the case after its prior counsel withdrew.

Despite being ordered to have counsel appear on or before October 4, 2013, a Deputy Attorney General appeared on behalf of the People during the December 5, 2013 preliminary pre-trial conference and requested further time to prepare the case because the People "did not have a prosecutor available due to staffing concerns and requested that the Court allow these matters to continue without an assigned prosecutor until March or April 2014." (J.A. 2445.) Rivera's counsel objected and reaffirmed his desire for trial to commence as soon as possible. The

Superior Court denied the request, stating that to continue the case until March 2014 would be "unconscionable," and chastised the prosecutorial office for "fil[ing] a case against an individual and not be[ing] ready to proceed within a practical — a reasonably practicable time." (J.A. 406.) Trial commenced in January 2014.

The majority of the delay in this case is directly attributable to the People, due to its failure to dedicate the resources needed to reviewing the large amount of discovery for a decade-old case with multiple defendants. Thus, this factor weighs in Rivera's favor. Assuming the reasons given for the People's continuances were true, it appears that the Virgin Islands Attorney General's office was overwhelmed with the size and scope of the case and had difficulty assigning a prosecutor who was able to dedicate sufficient attention to the matter. As we stated in *Francis*, even "more neutral reason[s for a delay,] such as negligence or overcrowded courts" are attributed to the government, as it is the government's responsibility to prosecute persons charged with crimes. 63 V.I. at 751 (quoting *Barker*, 407 U.S. at 531) (holding "delays caused by both the judge's and prosecution's family emergencies are attributable to the People"). At the very least, the People's delay amounts to negligent prosecution of Rivera and we do not condone such inaction. Without a doubt, the People should have handled this case more expeditiously or refrained from bringing charges against Rivera until such time that it had completed review of its many documents, and we find it troublesome that the People failed to complete much of the legal legwork for bringing the case to trial before charging Rivera with a crime committed over ten years earlier.

Next, this Court must examine whether the defendant asserted his right to a speedy trial, evidencing a deprivation of his constitutional rights. *Carty*, 56 V.I. at 366-67. In this case, Rivera requested his right to a speedy trial at his arraignment. And throughout the proceedings he repeatedly referred to his speedy trial rights and opposed motions for extension of time, clearly evincing a desire to commence trial as soon as possible. Although concerned about the pace at which the case was moving and voicing objections to every requested continuance, Rivera never formally requested a dismissal for the violation of his right to a speedy trial under the Sixth Amendment. Therefore, we cannot weigh this factor in his favor, despite his multiple objections, as he did not raise the issue in any meaningful way before the trial court. *Francis*, 63 V.I. at 752-753 (holding that "the failure to assert the right will make it difficult

for a defendant to prove that he was denied a speedy trial" (quoting *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995)); *United States v. Hassebrock*, 663 F.3d 906, 915 (7th Cir. 2011); *People v. Bancroft*, 23 A.D.3d 850, 803 N.Y.S.2d 824, 825-26 (2005) (defendant's failure to make a pretrial motion to dismiss the indictment or object on grounds of a speedy trial violation precluded the defendant from seeking appellate review on that issue). Instead we weigh this factor, although not strongly, in the People's favor.

Finally, we consider whether Rivera was prejudiced by these delays in any way. Rivera argues that a defendant "should be excused from demonstrating prejudice" where the prosecution's negligent "malfeasance spanned such a long period of time," which in this case is the 23 months it took to bring this case to trial. (Appellant's Br. 25.) As already noted, a Sixth Amendment right to a speedy trial "attaches at the time of an arrest or formal charge and protects a defendant from undue post-accusation delay." *Carty*, 56 V.I. at 361 (citing *Marion*, 404 U.S. at 313). Thus, we do not consider the ten year delay in arresting and charging Rivera as part of this analysis.

██ We disagree with Rivera's contention that he should be excused from demonstrating prejudice based only on a certain amount of delayed time in commencing trial. As discussed in *Francis*, a defendant must prove specific prejudice caused by the post-information delay. Rivera fails in this regard, and relies on the prejudice he suffered from the removal of his family — suffered by the majority of incarcerated individuals — and increased anxiety and concern caused by the high-profile nature of the case. We do not mean to diminish the hardships incarceration causes both the incarcerated and his or her family. But this type of prejudice is insufficient to prove a Sixth Amendment speedy trial violation. *Francis*, 63 V.I. at 754 (citing *Doggett*, 505 U.S. at 655).

Rivera also argues that the People's inability to promptly produce and respond to discovery hampered his defense and made it harder for him to locate witnesses regarding his whereabouts during the time of the alleged murder. Rivera's alleged inability to properly defend himself due to the post-information delay is a main priority that the Sixth Amendment seeks to protect against, along with oppressive pretrial incarceration and mental anguish and anxiety. *Id.* at 753; *United States v. Margheim*, 770 F.3d 1312, 1329 (10th Cir. 2014) ("Prejudice to the defendant . . . will be 'obvious' if witnesses die or disappear, or if witnesses lose their memory

of events that are critical to the theory of defense.") But Rivera's statements about missing witnesses are vague, without any indication as to what testimony they would have provided — if they could have been located — that would have aided in his defense. We do not find such speculation sufficient to show cognizable prejudice. *See Francis*, 63 V.I. at 754 (holding general prejudice "is insufficient to prove a Sixth Amendment speedy trial violation"); *Margheim*, 770 F.3d at 1331.

██ Balancing all of the factors, we cannot say that Rivera's Sixth Amendment speedy trial right was violated. He did not make a formal request for dismissal or prove actual prejudice caused by the delay. Although he did make multiple requests for a quick trial date, and the People caused the bulk of the delay in the case, the prejudice Rivera suffered due to the 23-month delay was not so egregious as to violate his Sixth Amendment right to a speedy trial.

### F. New Trial

██ In our decision *Ventura v. People*, 64 V.I. 589, issued on even date herewith, we address the argument of Rivera's co-defendant Ventura that the trial court abused its discretion in holding it did not have subject-matter jurisdiction over his motion for a new trial because it was filed one day past the filing deadline. For the reasons discussed in that opinion, we held that the Superior Court's determination that the 10-day filing deadline was jurisdictional was in error, and that SUPER.CT.R. 135, which governs motions for a new trial, is a claims-processing rule subject to waiver. *Id.*, 64 V.I. at 614, slip op. at § II.D. We thus remanded Ventura's case to the Superior Court to make a determination on Ventura's motion for a new trial in the first instance. *Id.* Although Rivera failed to raise this issue both before the trial court and on appeal, we conclude that justice requires that his case also be remanded to the Superior Court for a new trial determination. *See Boston v. People*, 56 V.I. 634, 645 (V.I. 2012).[26]

Generally, "[a]n appellant's failure to raise an issue in an opening brief ordinarily constitutes abandonment or waiver of that issue." *Id.* (citing *Bernhardt v. Bernhardt*, 51 V.I. 341, 346 (V.I. 2009); V.I.S.CT.R. 22(m)).

---

[26] We also note that during trial, the parties and the Superior Court stipulated to the fact that an objection by any one defendant would apply to all co-defendants, in an effort to streamline the process and keep the proceedings moving.

However, "for good cause shown" this Court may "suspend the requirements or provisions of any of [the Supreme Court] Rules in a particular case." V.I.S.CT.R. 2; *Boston*, 56 V.I. at 645. In *Boston*, we held that "the interest associated with complying with appellate procedures is not adequate to warrant treating co-defendants differently on appeal." *Id.* (citing *United States v. Rivera Pedin*, 861 F.2d 1522, 1526 n.9 (11th Cir. 1988) (reversing trial court's denial of a motion for a new trial as to both co-defendants, even though only one co-defendant raised the issue before both the trial and appellate courts); *United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980) (granting relief to both defendants where one co-defendant did not adopt by reference the other co-defendant's arguments); *United States v. Anderson*, 584 F.2d 849, 853 (6th Cir. 1978) (reversing convictions for two co-defendants where only one raised an evidentiary issue prior to oral argument — at which time the other co-defendant attempted to adopt the same argument — because "it would be a manifest injustice to allow [one] conviction to stand while ordering a new trial for [the other].")). Essentially, the "disparate treatment of identically situated co-defendants constitute[s] 'manifest injustice' " and may result in this Court addressing an issue raised by one defendant but waived by another. *Boston*, 56 V.I. at 644-45 (citing *United States v. Olano*, 934 F.2d 1425, 1439 (9th Cir. 1991), *rev'd on other grounds*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).

 In *Boston*, one co-defendant argued on appeal that the Superior Court abused its discretion by denying the co-defendant's motion for a new trial without conducting an evidentiary hearing regarding juror misconduct. *Id.* at 644. We reasoned that where a co-defendant properly raises an issue predicated on the same facts from the same trial, and the People have had the "opportunity to fully brief" the same issue, then "it would be manifestly unjust to remand" one co-defendant's case and not the other co-defendant's case. *Id.* at 645-46. The same circumstances appear in this case. Ventura bases his motion for a new trial on the same basic arguments raised in Rivera's motion to acquit, namely, that Coogle's testimony is insufficient to support a conviction of guilty beyond a reasonable doubt. Although the two motions would be reviewed under different standards, should the Superior Court grant Ventura's motion for a new trial, it would be manifestly unjust to deny Rivera the same opportunity simply because his counsel failed to make the same argument, given that the facts supporting a motion for a new trial in

Ventura's case are the same facts that would support a motion for a new trial in Rivera's case. Although concerned about remanding this case for a determination on a motion that was not properly before the Superior Court as to Rivera, we nevertheless find that under the specific facts in this case, manifest injustice would result if we remand only Ventura's case for the Superior Court to consider on the merits his motion for a new trial. Accordingly, we also remand this matter to the Superior Court so that it may make a determination as to whether a new trial should be granted as to Rivera.

## III. CONCLUSION

Accordingly, we hold that Coogle's testimony must be viewed with special scrutiny as she presented the only evidence that Rivera murdered Williams, but ultimately her testimony was not inherently improbable or incredible. Thus, because her testimony — which the jury must have believed — proved all elements of murder in the first degree, we find the evidence was sufficient to uphold Rivera's conviction. Next, we hold that section 26 of the ROA authorized the People to demand a jury trial in criminal cases. However, the defendant is still entitled to an *impartial* jury that has not already made up its mind based on media reports. We do not find that the alleged media coverage of this case was so pervasive that the selected jurors were biased against Rivera. Finally, there was much delay in both charging Rivera for Williams's murder and in bringing him to trial. Despite the long delays, all based on the People's inaction, Rivera failed to show under both Fifth and Sixth Amendment tests that he suffered actual and substantial prejudice. This failure was fatal to both claims. Nonetheless, the Superior Court erred when it determined it did not have jurisdiction to hear Rivera's co-defendant Ventura's motion for a new trial and thus, because we hold that Ventura is entitled to a determination on the merits of that issue, *see People v. Ventura*, 64 V.I. at 614, slip op. at § II.D, we remand this case so that the Superior Court can decide the issue of a new trial in the first instance as to Rivera as well.